### E. RAUH & SONS FERTILIZER CO. v. SHREFFLER.

No. 9497.

Circuit Court of Appeals, Sixth Circuit.

Dec. 1, 1943.

Walter A. Eversman, of Toledo, Ohio, and Gustav H. Dongus, of Indianapolis, Ind. (Williams, Eversman & Morgan and Walter A. Eversman, all of Toledo, Ohio, and Gustav H. Dongus, of Indianapolis, Ind., on the brief), for appellant.

Wayne R. Peppers, of Toledo, Ohio (Holloway, Peppers & Romanoff, Louis R. Romanoff, and Wayne R. Peppers, all of Toledo, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and Mc-ALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

Removed from the state court because of diversity of citizenship and tried to a jury, the cause resulted in a judgment for the appellee for damages to his growing plants proximately resulting from injurious gases generated by the fertilizer plant of the appellant. The judgment is assailed upon the ground that it was not supported by substantial evidence, and that the cause was submitted to the jury upon an erroneous view of the law of nuisance and the measure of damages.

The appellee is an experienced grower of gladioli. In 1940 he planted 11 acres of his farm near Toledo to cut flowers, planting stock, and bulblets. In the early part of June the plants began to show signs of burning at the tips and this condi-

tion spread until a substantial part of the leaves were burned, with a resulting reduction in the value of his crop. Upon submitting samples to plant pathologists of Ohio State University, and upon an inspection of the area, the appellee concluded that the burning was caused by sulphur dioxide emitted from the plant of the appellant, and so brought his ·suit. Originally it was based upon the theory that the fertilizer plant emitted noxious fumes continuously and that the injury to the gladiolus crop resulted from their cumulative effect. Upon learning, however, that the spring operation of the plant ·did not begin until June 1, the appellee rested his case upon an alleged breakdown of a fan on June 4. This, he claimed, permitted ˙excessive quantities of $SO_2$ to be released into the air and carried by prevailing winds onto his land where, combined with moisture of the atmosphere, they formed a sulphurous acid which entered the leaves of his plants and stunted their growth.

The appellant manufactures superphosphate fertilizer from phosphate rock. Mixed with an approximately equal weight of diluted sulphuric acid and dumped into a bin a reaction takes place, and phosphorous compounds and calcium sulphate are the result. The reaction generates sufficient heat so that most of˙the excess water is boiled off along with gaseous by-products. In the process, an exhaust fan draws the fumes through a flume and water spray which removes most of the soluble gases, the remainder being released into the atmosphere through a stack. Of these gases counsel for the appellant said in his opening statement, "In order to make those gases entirely harmless, the company has installed a flume or water conveyor" and the president of the Fertilizer Company, in explaining the purpose of the flues that lead from the mixer and the bin, said they were "to give passage for gas and steam that come off the bin and mixer in order to scrub it," insisting, however, that sulphur dioxide fumes, if they were not washed, would not affect vegetation unless in sufficient concentration with a sufficient time interval for exposure.

▮ Upon consideration of denial of a motion for directed verdict, based upon lack of substantial evidence to warrant submission of an issue of fact to the jury, it is axiomatic that the evidence should be viewed in the light most favorable to the plaintiff and that the reviewing court is not concerned with the weight of the evidence or the credibility of witnesses. There is evidence that the fan in the appellant's plant broke down on June 4, that the water in the spray was turned off, and that the manufacture of fertilizer nevertheless continued until the 50 tons contained in the bin were processed. While this evidence was challenged we are unable to hold that it was insubstantial. $SO_2$ is produced in the proportion of $10\frac{1}{4}$ parts per million of air directly over the boiling mixture, and in concentrations as low as two parts per million is harmful to plant life. There is also evidence that a fan-shaped trail of discolored and burned vegetation could be traced from the fertilizer plant through a woodlot and across intervening fields to the appellee's land approximately one-half mile from the fertilizer plant, and that prevailing winds blow from the plant toward his farm. The appellant's theory was that injury to the gladioli plants resulted from soil deficiency and lack of fertilizer since the appellee used no sprays, but the plaintiff's expert found no evidence ˙of plant disease and no evidence of deterioration in vegetation in the vicinage out of the area of the fan-shaped trail.

The appellant submitted evidence to show that gases diffuse through the atmosphere in proportion to the distance from their source, and contends, therefore, that it would be impossible for any appreciable amount of gas to remain in the air which reaches the plaintiff's land. Its formula for such diffusion cannot, of course, be a constant, since much would depend upon the direction and velocity of the wind and atmospheric conditions at the time of injury. There are cases such as United Verde Copper Co. v. Ralston, 9 Cir., 46 F.2d 1, where relief has been granted for injury from fumes where the source was much more distant than in the present case. In the cited case the distance was 16 miles, and though the proportion of injurious fumes was far greater than here, their theoretical diffusion by applying appellant's formula was probably as great as here if not, indeed, more so. Moreover, it is possible, and highly probable, that when the fan was not operating the concentration of gases in the bin and flume would build up to a higher proportion than the $10\frac{1}{4}$ parts per million of air. In any event, we are unable to say that the theoretical formula for diffusion destroys the evidence of the existence of a trail of discolored and burned

vegetation or precludes any reasonable inference that the jury may have drawn therefrom.

While no Ohio case is cited to us and none has been found by independent research, which considers the substantiality of evidence in this type of case, it has elsewhere been held that a plaintiff sustains his burden when he shows that his plants have been destroyed, that the defendant's factory was emitting fumes and gases destructive of plant life, that the winds were blowing toward his premises, and that no other agency of destruction existed in the vicinity. Wichers v. New Orleans Acid & Fertilizer Co., 128 La. 1011, 55 So. 657, cited with approval in Courtney v. American Zinc, Lead & Smelting Co., 104 Kan. 362, 179 P. 342. A fan-shaped trail, as a characteristic sign of burning by $SO_2$, is heavily relied upon in Anderson v. American Smelting & Refining Co., D.C. Utah, 265 F. 928, wherein the effects of sulphur dioxide upon plants is also discussed. Our conclusion is that the evidence of causation was sufficiently substantial to warrant a submission of the issue to the jury.

The court charged the jury that if the fumes escaped from the defendant's plant because of an unreasonable use of its property, such use constituted a nuisance. This is assailed as an erroneous instruction of the law on the ground that a fertilizer plant is not a nuisance per se, and that unless intentional a nuisance does not derive from a single non-recurring act unless coupled with negligence of which there was no proof. The court declined to submit the issue of negligence to the jury and specifically instructed the jury that one who creates or maintains a nuisance is liable for the resulting injury without regard to the degree of care or skill exercised by him to avoid such injury. It is this instruction that presents the main problem in the case.

A nuisance rests upon the maxim, "sic utere tuo ut alienum non laedas," that one's enjoyment and use of his own property should be such as not to injure the rights of another in his property. The leading case applying the maxim is the early case of Rylands v. Fletcher, L.R., 3, H.L., 330. The courts of Ohio have, however, recognized that it does not present a hard and fast rule to be generally employed, and decisions are carefully collected and exhaustively reviewed in O'Day v. Shouvlin, 104 Ohio St. 519, 136 N.E. 289,

25 A.L.R. 980, where the conclusion is reached that liability of an insurer does not rest upon a manufacturer operating a lawful business in a lawful manner unless the operation of such business is inherently noxious or carried on in a negligent manner.

Yet the Ohio courts have generally allowed recovery for damages resulting to property from manufacturing or other operations which are not nuisances per se, Anton v. Dayton Malleable Iron Co., 30 O.L.A. 312; Ohio Stock Food Co. v. Gintling, 22 Ohio App. 82, 153 N.E. 341; Louisville Brick Co. v. Calmelat, 6 Ohio App. 435, and including damages caused by the noxious odors of fertilizer plants, Reifsnyder v. Canton Fertilizer Co., 9 Ohio App. 161; McClung v. North Bend Coal & Coke Co., 9 Ohio Cir.Ct.R. 259, and Barkau v. Knecht, 9 Ohio Dec. Reprint 66. But in all of these cases the wrongful acts were either recurrent or continuous over a substantial portion of time, while in O'Day v. Shouvlin, supra, there was but a single act, non-recurrent and non-continuous, from which injury flowed. In the cases which granted relief, liability was upheld on the ground of nuisance without consideration of the question of negligence. It must therefore be concluded that the principle underlying the distinction is that a continuous or recurring act must be characterized as an intentional wrong and so will sustain recovery without proof of negligence.

But a single non-recurrent act leading to injury may likewise be intentional, Restatement of Torts, 220, 221, and interference with the use and enjoyment of land involving substantial harm caused by liability forming conduct, may subject the actor to liability however brief in duration the interference may be. Id. 222, 223. Thus viewing the law we give consideration to the record. It is an inference reasonably to be drawn that one of the purposes of the fan, flume and water conveyor, if not, indeed, the most important purpose, was to render the gases resulting from the reactions in the fertilizer plant harmless to vegetation or other property of the surrounding area. From evidence which the jury was entitled to credit, it appears that this assembly failed, but, notwithstanding such failure, the reactions which produced the harmful gases continued for an appreciable length of time. If the injury was foreseeable and preventable, it was, in the

**42**

eyes of the law, intentional, and this without regard to whether the apparatus itself failed because of pure accident or because of lack of due care or negligence. That injury was foreseeable is implicit in the fact that safe-guards were installed to prevent it. Nevertheless, the operation continued without them. In such posture it must be concluded that if injury flowed from continued operation without safe-guards, the operation was deliberate, whether failure of the fan was the result of accident or due to negligence.

Such interpretation of the law was given to the jury, "Through the use of improved methods and appliances, an occupation that formerly might have been regarded as a nuisance because of the annoyance it caused may now be carried on without offense or injury to anyone. However, if such improved methods and appliances are defective or out of repair, and damage or injury results, it is not necessary in such case to establish negligence on the part of the owner. If it would constitute a nuisance without the use of improved methods and appliances, then that fact may be taken into consideration in determining whether or not it becomes a nuisance when those methods and appliances fail." We think this was a correct statement of the law and that the jury was not misled.

Upon the measure of damages the court charged that the plaintiff could recover the difference between the value of its crop as it stood before and after the injury. The defendant contends that the proper measure is the difference between the value of the crop actually produced and that which would have been produced but for the injury, less the cost of preparing for market the part which did not mature. A careful reading of United States Smelting Co. v. Sisam, 8 Cir., 191 F. 293, 37 L.R.A.,N.S., 976, upon which appellant principally relies, indicates that the court announced the correct rule. The rule urged by the appellant is but a means of estimating the actual injury suffered by the growing crop, and the difference between actual and anticipated value may be an element to be taken into consideration along with other factors, but the real measure of damage is the injury to the crop at the time it is inflicted, measured by its difference in value before and after injury. While valuations rested upon nothing more persuasive than the opinion of the plaintiff and his former employer, they were not controverted and the jury's verdict was for a sum little more than a third the amount so proved. We will not disturb it.

The judgment is affirmed.