**Max WRIGHT, Plaintiff,**

v.

**MASONITE CORPORATION, Defendant.**

**No. C-99-WS-63.**

United States District Court
M. D. North Carolina,
Winston-Salem Division.

Jan. 8, 1965.

Norwood Robinson and W. F. Maready, Winston-Salem, N. C., for plaintiff.

Arthur O. Cooke, Greensboro, N. C., and Russell VanLandingham, Thomasville, N. C., for defendant.

EDWIN M. STANLEY, Chief Judge.

This is an action by the plaintiff, a citizen and resident of Davidson County, North Carolina, against the defendant, a Delaware corporation with its principal office in Chicago, Illinois, to recover damages to his person and property by reason of an alleged nuisance created by the defendant.

The case was tried by the Court without a jury. At the conclusion of the trial the parties were afforded an opportunity to file requests for findings of fact and conclusions of law and briefs in support of their respective positions. The requests for findings of fact and conclusions of law and briefs of the parties having been received, the Court, after considering the pleadings and evidence, including exhibits and stipulations filed, and briefs and oral argument of counsel, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

## FINDINGS OF FACT

1. The plaintiff is a citizen and resident of Davidson County, North Carolina.

2. The defendant is a Delaware corporation with its principal office in Chicago, Illinois, and operates a finishing plant in Davidson County, North Carolina.

3. The amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.00.

4. For approximately 17 years prior to February 4, 1963, the plaintiff operated a small food supermarket at the southeast corner of the intersection of Julian Avenue and Carolina Avenue in Thomasville, North Carolina. At this intersection, Julian Avenue runs north and south and Carolina Avenue runs east and west.

5. From 1960 until the business was closed on February 4, 1963, plaintiff's grocery store was a one-story brick and solite block building 60 feet in width and 40 feet in depth. The front of the building was on Julian Avenue and faced west. Along the rear wall of the structure were four small casement windows, each approximately 12 inches by 18 inches. Access to the building was through doors on the front or west side. The distance from the floor to the ceiling of the store was 8 feet and 9 inches.

6. The plaintiff's supermarket included a freezer for the display and sale of frozen vegetables and other groceries. It also included a meat market, an ice cream freezer and meat cooler. Plaintiff sold a general line of groceries in the store as well as some items of dry-goods.

7. The structure in which plaintiff operated his supermarket was heated by means of a suspended gas-fired heating unit located at a point approximately 25 feet from the south wall and about four feet from the east wall of the building. The unit did not draw fresh air into the store, but was provided with means for expelling exhausted air from within the building to the outside. Air within the building was constantly recirculated through the heating unit.

8. From 1954 until the summer of 1962, the defendant operated a finishing plant located on the north side of Carolina Avenue, and diagonally across Carolina Avenue from the plaintiff's store. In the summer of 1962, the defendant moved its finishing operations to a building located on the south side of Carolina Avenue and approximately 178 feet east of plaintiff's store. After it was moved, defendant's finishing plant was from 50 to 60 feet nearer plaintiff's store than when formerly located on the north side of Carolina Avenue. The area in which the plaintiff's store and defendant's finishing plant were located was a semi-residential district in the City of Thomasville, North Carolina, and the businesses operated by the plaintiff and the defendant were the only businesses located in the immediate area.

9. During the latter part of 1962 and the early part of 1963, there were two residences located between the plaintiff's store and the defendant's finishing plant. The first of these residences was 63 feet from plaintiff's store, and directly in line between the store and defendant's finishing plant. This residence was a small, frame structure measuring 25 feet in width and 46 feet in depth. Adjacent to and about 35 feet east of the first residence was a second residence, likewise a small, frame one-story building measuring 29 feet in width and 46 feet in depth. The east wall of the latter

residence was located about 20 feet from the west wall of the defendant's finishing plant. Other dwellings were located across the street from plaintiff's store.

10. In the operation of its finishing plant, unfinished masonite boards were shipped to the defendant in Thomasville and then cut and finished to the specifications and orders of customers. The finished products were used primarily in the furniture industry. Located in the defendant's finishing room were facilities for applying finishing materials to its products. This was done in two ways. One method was through the use of a roll coat process, and the second method was the application of finishing materials by use of a spray gun within a spray booth.

11. Prior to July of 1962, the finishing room of the defendant had several exhaust fans on the roof which discharged fumes from within the finishing room into the atmosphere. These exhaust fans served to discharge fumes from the apparatus used in the roll coat process as well as fumes from the spray booth operation. Both finishing methods had been in use by the defendant for several years prior to July of 1962 when the finishing room was removed to the new building located across Carolina Avenue.

12. When the defendant moved its finishing room from the north to the south side of Carolina Avenue, the equipment which had been used in the finishing process for both the roll coat method and the spray booth method was removed from the old building. The finishing operation was set up along the west side of the new building, the side nearest the plaintiff's store. In transferring the spray booth operation, the booth itself, along with its two exhaust fans and the spray guns, was transferred from the old building to the new building, and the spray booth operation in the new building was identical with the spray booth operation which had been conducted in the old building. The conveyor system used in the roll coat process was likewise carried to and installed in the new building. This operation remained the same, with the exception of the addition of air blown along the conveyor lines by means of a make-up air unit installed on the roof of the new building.

13. The materials finished by the roll coat process utilized a conveyor system. The finishing materials were applied to the masonite boards as they passed along a conveyor belt. The boards then passed over two separate banks of infrared lamps, each containing 40 to 50 such lamps. Each of the lamps was approximately six inches in diameter, and the masonite boards with the freshly applied finishing material passed over the two banks of lamps at a distance of approximately 10 inches. The purpose of the lamps was to apply heat to the finishing material and thereby accelerate the drying process. The spray booth, a three-sided booth approximately eight feet long and four feet deep, was used for the application of a particular finish on masonite boards. The finishing process in the spray booth involved the application of varnishes and lacquers to masonite boards by use of a spray gun, which atomized the varnishes or lacquers into a fine mist. In comparison with the conveyor system, the spray booth required three or four times as much lacquer or varnish to finish masonite boards because of the fact that the majority of the material used in the spray booth escaped into the air, and was thus taken out of the spray booth and the building by means of the exhaust system.

14. On or about December 1, 1962, the defendant began using a "make-up" air unit in its finishing plant. Generally, the function of the make-up air unit was to draw in filtered air from the outside of the building, and then exhaust same out of the building by eight exhaust fans located on the roof of the finishing room and leading to exhaust vents on top of the building. The air drawn into the building in December of 1962, and in January and February of 1963, was heated before reaching the finishing process. Upon reaching the finishing process, the heated

air was passed over the varnishes and lacquers applied to the masonite boards on the conveyor system. The purpose of this was to accelerate the drying of lacquers and varnishes. A part of the air also came through the spray booth and was exhausted out of the top of the building by two of the exhaust fans located in the top of the spray booth. None of the air was filtered or otherwise purified before being exhausted into the air from the eight exhaust fans on top of the building. One of the purposes for the make-up air unit was to warm the outside air during cold weather prior to the time it was brought into the finishing room.

15. At all times pertinent, the defendant used two general classifications of finishing materials in its Thomasville plant. One type of finishing material contained no urea-formaldehyde, or formaldehyde in any other form. This type of finishing material was a nonsynthetic lacquer or varnish and accounted for about 95 per cent of the masonite boards finished at the defendant's plant. This natural lacquer or varnish without urea-formaldehyde was used in finishing boards by the roll coat process. A second classification of lacquers and varnishes was that known in the industry as synthetic lacquers or varnishes, and contained a urea-formaldehyde resin. The use of synthetic lacquers and varnishes accounted for about five per cent of the production of the defendant, and was the material used exclusively in the spray booth. These synthetic lacquers and varnishes had been used by the defendant over a period of several years. A urea-formaldehyde resin is produced by combining urea and formaldehyde. This combination is then mixed with other chemicals and compounds in various quantities and proportions to produce what is known in the trade as a synthetic lacquer or a synthetic varnish. In the manufacturing process, the urea and formaldehyde do not always result in a perfect combination of the two chemicals, and the result in the finished product in such case is a very small percentage of "free" formaldehyde. Further, when a catalyst, such as heat or certain acids, is applied to a synthetic lacquer or varnish containing urea-formaldehyde resin, the result is the chemical breakdown of the urea-formaldehyde compound. This breakdown process, among other things, produces formaldehyde gas and ammonia. Where such breakdown occurs in a lacquer or varnish containing a urea-formaldehyde resin, the odor of formaldehyde is given off as well as the characteristic odor from ordinary varnishes and lacquers. However, products finished by the defendant by the use of synthetic lacquers and varnishes were not subjected to heat beyond that in the building to facilitate the drying process, but the synthetic materials used in the spray booth were mixed with an acid catalyst before they were applied.

16. Prior to December of 1962, no odor problem of consequence was present in the vicinity of the defendant's finishing plant, and none of the residents of the area had ever made any complaint to the defendant concerning any condition created by the operation of its business.

17. Beginning the latter part of December of 1962, the plaintiff noticed an odor in and around his store similar to that of varnish or lacquer. In early January, 1963, the odor became more pronounced, pungent and penetrating, and was later identified as being the odor of formaldehyde gas. These strong, noxious odors, both inside and outside the plaintiff's store, continued until about February 20, 1963, after which they were rarely noticeable in the atmosphere.

18. During the early part of January of 1963, customers of the plaintiff began returning food that had been purchased at his store, complaining that it had a bitter or "off" taste. At first, such foods consisted principally of eggs and meat products. When the return of groceries persisted and accelerated, plaintiff requested the assistance of State and local health officials in an attempt to find the source of the problem. At the suggestion and advice of the health officers, plaintiff made various efforts to determine

the source of the odors, which efforts included washing out the meat counter on several occasions and disposing of the meat contained therein, and the employment of experts to check the heating and cooling systems in the store. These efforts failed to locate the source of the trouble.

19. By the end of January of 1963, the odor in the store had permeated practically every item of food, except those items enclosed in glass or tin cans. The bitter or "off" taste first noticed in eggs and meat products was finally detected in sealed cigarette packages, oatmeal and bread containers, groceries contained in plastic or paper containers, and practically every other item, except, as earlier noted, canned goods and goods sealed in glass. Because of the problem created by the noxious and penetrating odors, the plaintiff closed his meat market on January 31, 1963, and his entire store on February 4, 1963. The store has not since reopened, and at the time of the trial, most of the groceries, including the canned goods, remained in the store.

20. During the week of February 11, 1963, George Davis, an expert chemist with many years of experience with formaldehyde and its chemical properties, tested various air samples in the plaintiff's store and surrounding atmosphere. Four different tests, all utilizing recognized procedures, showed the presence of substantial quantities of formaldehyde gas, both inside and outside the store, during the week the tests were run. The test made on the outside of the store showed comparable amounts of formaldehyde gas as the test taken inside of the store. The odors which were present both inside and outside the store during the week of February 11, 1963, were the same as the odors detected by the plaintiff since the early part of January. Although the odor was described by some lay witnesses as being similar to that of varnish and lacquer, it is found that the odor was caused in part by formaldehyde gas.

21. Other investigations were made by State and Federal health officials.

Air samples, taken both inside and outside the plaintiff's store, were collected and analyzed by other firms and governmental agencies during the month of February of 1963. In collecting the air samples, methods different from that employed by Mr. Davis were used. There is no evidence that any of the methods employed to collect air samples were not proper. Some of the tests failed to reveal the presence of formaldehyde in the atmosphere, while others taken from inside of the plaintiff's store revealed the presence of formaldehyde, but in a smaller quantity than the tests conducted by Mr. Davis. Tests were also made of lighter fluid found in the plaintiff's store. These tubes of lighter fluid were attached to charcoal bags and located near the gas heater used to heat the store. There was some evidence that the lighter fluid, when heated to a certain point, could result in decomposition which could produce a formaldehyde gas, and some evidence that the heat produced by the gas-fired heater in the store was of sufficient intensity to decompose the lighter fluid. However, from all the evidence, the Court is convinced, and finds as a fact, that the odor problem experienced by the plaintiff during the months of January and February of 1963 came from a source outside the store. Significant in this regard is the fact that food samples placed in a number of residences in the area by the health authorities were found to contain the same bitter or "off" taste as the food purchased from the plaintiff's store, and the further fact that the evidence is overwhelming to the effect that the same odor detected inside the store was also detected outside the store. Additionally, the method used by Mr. Davis in collecting and testing air samples, both inside and outside of the store, all of which disclosed substantial quantities of formaldehyde, was not criticized or discredited by any of the witnesses. This positive testimony offered by Mr. Davis is far more convincing than the negative testimony offered by some of the other witnesses. And finally, the defendant fell woefully short in its effort to establish that the

presence of the lighter fluid, or any other substance or condition inside the store, produced the noxious and penetrating odors that compelled the plaintiff to close his store and abandon his business.

22. Formaldehyde gas produces a very pungent, penetrating and noxious odor. Formaldehyde itself is a very volatile and active chemical. A significant characteristic of formaldehyde gas is that it will penetrate almost every container found in a grocery store, except tin and glass. The penetration of meat and other groceries by such gas will render the food inedible and unfit for human consumption. It is found that the formaldehyde gas encountered in plaintiff's store was in sufficient quantities to permeate and render inedible most grocery items not sealed in glass or in tin cans.

23. It is not disputed that during the month of December of 1962, and the months of January and February of 1963, the defendant purchased and used quantities of synthetic lacquers and varnishes containing urea-formaldehyde in its spray booth operation. While there were a number of furniture factories in the Thomasville area using the same type of lacquers and varnishes as those used by the defendant in its spray booth, and there is one company in the area that manufactures synthetic lacquers and varnishes, there is no evidence that any business in the vicinity of plaintiff's store, other than the business of the defendant, uses such lacquers and varnishes. As earlier noted, the synthetic materials used by the defendant during the period in question were mixed with an acid catalyst which had the same effect on the materials as heat. Thus, the liquid catalyst applied to the synthetic materials used in the spray booth would cause the urea-formaldehyde resin in the materials to break down and give off formaldehyde gas, which was exhausted from the spray booth and into the atmosphere without filtering. Further, during the drying process, the masonite boards finished with the material containing urea-formaldehyde resin would give off the odor of formaldehyde, as well as other characteristic odors, even at room temperature. These odors were likewise exhausted from the finishing room through the exhaust vents located on the top of the building.

24. The formaldehyde gases and other odors given off by the lacquers and varnishes used in the defendant's plant were exhausted from the plant for the purpose of removing the undesirable odors and fumes from the finishing room. One characteristic of formaldehyde gas is that it tends to adhere to itself, and when the humidity is high the gas tends to stay close to the ground rather than rise in the air. Accordingly, the plaintiff and other people in the immediate vicinity of the defendant's plant were particularly affected by the gas fumes at times when the humidity was high. On days when the humidity was high and the wind was blowing from the direction of the defendant's plant toward the plaintiff's store, the odors in and near the plaintiff's store were particularly offensive.

25. From all the evidence, it is found that from the latter part of December of 1962, and continuing until on or about February 18, 1963, the defendant's plant discharged formaldehyde gases, and other gases with the odor of varnishes and lacquers, into the atmosphere in substantial quantities. It is further found that the formaldehyde and other gases discharged by the defendant's plant entered the plaintiff's place of business and permeated the groceries therein, resulting in the plaintiff having to close his store on February 4, 1963.

26. In addition to the damages caused to his business by the discharge of the formaldehyde and other gases, the plaintiff claims that he developed bronchitis in February of 1963, and that this condition also resulted from inhaling the gases discharged from the defendant's plant. While the plaintiff was undoubtedly ill for about three months during the spring of 1963, he has failed to sustain his allegation that his illness resulted from any fumes discharged from the defendant's

plant. The plaintiff offered the testimony of Dr. C. O. Plyler, Jr., who has been engaged in the general practice of medicine in the Thomasville area for more than seven years, who stated that he saw the plaintiff on February 8, 1963, and thereafter over a period of about three months, and that he was found to have bronchitis. Dr. Plyler expressed the opinion that plaintiff's condition could have resulted from the inhalation of formaldehyde fumes. However, he further testified, with some reluctance, that he treated plaintiff a year earlier for a condition diagnosed as acute bronchitis. The treatment and period of disability in 1962 were substantially the same as the treatment and period of disability in 1963. Consequently, the Court finds that there is no relationship between the fumes, gases and odors discharged from the defendant's plant during the early part of 1963 and the illness suffered by the plaintiff during the same period.

27. The evidence with respect to the damage sustained by the plaintiff as the result of being forced to close his business is rather indefinite. For the year 1962, the net profit realized by the plaintiff from the operation of his grocery store was about $3,200.00, and had been the same for several years prior thereto. The store building was owned by the plaintiff's father, and the plaintiff paid no rent for the use of the building. If a reasonable rent had been paid, the profit from the operation of the business would have been that much less. As of December 31, 1962, the plaintiff had an inventory of salable merchandise of about $7,774.00. This inventory did not include the refrigeration equipment, cooler boxes, counters, shelving, and other equipment used in the operation of the store, on which no valuation was placed. The plaintiff testified that his business was worth about $20,000.00 before it was closed and about $1,500.00 after it was closed. He further estimated that he destroyed merchandise having a value of about $1,000.00 during the period he encountered the odor problem. After carefully considering all of the evidence

bearing on the issue of damage, it is found that the plaintiff suffered a loss and damage as a direct and proximate result of the odors and gases which entered his store from the defendant's building in the amount of $12,000.00.

28. Plaintiff did not initially associate the odor in his store with any activity of the defendant in the operation of its plant. He did not notify the defendant of his difficulty until February 1, 1963, three days before he closed his store, when representatives from the local health department went to the defendant's plant and talked with its assistant manager. The defendant knew for a number of years that it was discharging the fumes from its finishing plant, including fumes from the synthetic materials used in its spray booth containing urea-formaldehyde, into the atmosphere. The make-up air unit installed in the fall of 1962, and placed in operation during the early part of December of that year, undoubtedly exhausted the fumes with greater force and dissipated them over a wider area than before, but it did not result in the exhaustion of any fumes that had not been previously exhausted into the atmosphere. As earlier noted, the odor problem started during the latter part of December of 1962, and ceased during the latter part of February of 1963, without the defendant making any material changes in the method employed in finishing its masonite boards, or in the lacquers or varnishes used in the finishing process, except the installation of the make-up air unit. While the evidence is overwhelming that the odor problem at the plaintiff's store emanated from the defendant's plant, and such has been found as a fact, no suggestion has been made, with the possible exception of the presence of unusual atmospheric conditions, as to why the odor problem existed during this particular period, and not earlier or later. The plaintiff argues that the defendant was derelict in not filtering the fumes from its finishing plant before discharging them into the atmosphere, but there was no substantial evidence that any filtering method is known to or employed by other business-

es where similar materials are used and similar fumes and gases are exhausted. There was nothing to indicate to the defendant the possibility of creating a nuisance of the type described by the plaintiff.

## DISCUSSION

■ The question for decision is whether the facts as found impose liability upon the defendant for the damages sustained by the plaintiff. This being a diversity suit, we must look to the substantive law of the State of North Carolina in making this determination.

■ It should first be noted that the plaintiff does not charge the defendant with the negligent operation of its business, but rather charges a conduct amounting to a nuisance. Negligence and nuisance are distinct fields of tort liability. While the same act may constitute negligence and also give rise to a private nuisance, a private nuisance may be created or maintained without negligence. As an examination of the authorities will reveal, most private nuisances are created or maintained, and redressed by the court, without proof of negligence. Watts v. Pama Manufacturing Company, 256 N.C. 611, 124 S.E.2d 809 (1962).

■ One of the earlier North Carolina cases dealing with the liability imposed upon the operator of a private business with respect to the rights of others in the vicinity is King v. Ward, et al., 207 N.C. 782, 178 S.E. 577 (1935). There the court stated:

" * * * a legitimate and proper business enterprise located in a town, which enterprise is not in itself a nuisance, is subject to no liability to adjacent property owners or others in the vicinity for the ordinary, careful, and reasonable operation of the business. It is the negligent and unreasonable operation and maintenance that produces the nuisance, and the nuisance thus created imposes liability."

In the same case, the Court approved the following jury instructions given by the trial judge:

" * * * The law does not recognize every business or use of property as a nuisance that imparts a degree of impurity to the air, for if such were the case towns could not be built or life in compact communities tolerated, and even the ordinary uses of property would certainly be interfered with, for in proportion to the sparseness or compactness of a population the air is pure or impure. One cannot reasonably occupy a dwelling house or place of business and use any kind of fuel therein, without imparting more or less of impurity to the atmosphere, and in proportion as these are aggregated in one locality, are these impurities increased, but as these are among the common necessities of life, and absolutely indispensable to its reasonable enjoyment, the law does not recognize them as being actionable interference with the rights of others, unless exercised in an unreasonable manner so as to inflict injury on another unnecessarily."

Perhaps the two leading cases in North Carolina dealing with the law of nuisance are Morgan v. High Penn Oil Co., et al., 238 N.C. 185, 77 S.E.2d 682 (1953), and Watts v. Pama Manufacturing Company, 256 N.C. 611, 124 S.E.2d 809 (1962).

In the Morgan case, the defendant was charged with constructing and operating an oil refinery in such a manner as to constitute a nuisance in that it substantially polluted the atmosphere of the entire neighborhood and thus injuriously affected the plaintiffs in the use and enjoyment of their land. Significantly, the plaintiffs had advised the defendant of the nuisance, and had demanded that it be abated, and the defendant had refused to do so, before the commencement of the action. In discussing the essential elements of an actionable private nuisance, the court stated:

" * * * private nuisances may be classified as nuisances *per se* or at law, and nuisances *per accidens* or in fact. A nuisance *per se* or at law is an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings. * * * Nuisances *per accidens* or in fact are those which become nuisances by reason of their location, or by reason of the manner in which they are constructed, maintained, or operated. * * *

"Much confusion exists in respect to the legal basis of liability in the law of private nuisance because of the deplorable tendency of the courts to call everything a nuisance, and let it go at that. * * * The confusion on this score vanishes in large part, however, when proper heed is paid to the sound propositions that private nuisance is a field of tort liability rather than a single type of tortious conduct; that the feature which gives unity to this field of tort liability is the interest invaded, namely, the interest in the use and enjoyment of land; that any substantial nontrespassory invasion of another's interest in the private use and enjoyment of land by any type of liability forming conduct is a private nuisance; that the invasion which subjects a person to liability for private nuisance may be either *intentional or unintentional;* that a person is subject to liability for an *intentional* invasion when his conduct is unreasonable under the circumstances of the particular case; and that a person is subject to liability for an *unintentional* invasion when his conduct is *negligent, reckless or ultrahazardous.* * * *

"An invasion of another's interest in the use and enjoyment of land is *intentional* in the law of private nuisance when the person whose conduct is in question as a basis for liability *acts for the purpose of causing it, or knows that it is resulting from* his conduct, or knows that it is substantially certain to result from his conduct. * * * A person who *intentionally* creates or maintains a private nuisance is liable for the resulting injury to others regardless of the degree of care or skill exercised by him to avoid such injury. * * * " (Emphasis supplied.)

The Watts case involved the operation of a textile plant in such a manner as to cause the home of the plaintiffs to vibrate and shake, thus causing great annoyance, inconvenience and damage to the plaintiffs. Here again the plaintiffs demanded that the defendant cease the injurious operation, and the defendant refused to do so, before the institution of the action. It was first observed that in order for the plaintiffs to make out a *prima facie* case on the nuisance issue they must present evidence tending to show (1) that the defendant operated its mill in such a manner as to produce unreasonable noise and vibration under the circumstances existing, and (2) that because of such unreasonable noise and vibration, there was substantial injury and loss to the plaintiffs' property. The Court then went on to state:

"The mere fact that an invasion of another's interest in the use and enjoyment of land is intentional does not mean that it is unreasonable. Fundamentally, the unreasonableness of intentional invasion is a problem of relative values to be determined by the jury in the light of the circumstances of the case. The question is not whether a reasonable person in plaintiffs' or defendant's position would regard the invasion as unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable. Regard must be had not only for the interests of the person harmed but also for the interests of the defendant, and for the interests of the community. * * * What is reasonable in one locality and in one set of circumstances may be unrea-

sonable in another. * * * No single factor is decisive; all the circumstances in the particular case must be considered."

The Court further held, in harmony with the principles enunciated in the Watts case, that a person is subject to liability for an unintentional invasion of the property of another only "when his conduct is negligent, reckless or ultrahazardous."

In E. Rauh & Sons Fertilizer Co. v. Shreffler, 6 Cir., 139 F.2d 38 (1943), the defendant was charged with emitting sulphur dioxide from its fertilizer plant, thereby causing injury to the gladioli crop of the plaintiff. The evidence disclosed that normally the noxious fumes from the defendant's plant were exhausted by a fan which drew the fumes through a flume and water spray that removed most of the soluble gases, but that on the date in question the fan in the defendant's plant had broken down and the water in the spray had been turned off. The Court observed that an inference reasonably to be drawn from this evidence was that one of the purposes of the fan, flume and water conveyor, if not the most important purpose, was to render the gases emanating from the fertilizer plant harmless to vegetable or other property in the surrounding area. Since the defendant continued to operate its fertilizer plant, notwithstanding the failure of the filtering assembly, it was held that the jury was entitled to conclude that the injury was foreseeable and preventable, and thus in the eyes of the law, intentional, without regard to whether the apparatus itself failed because of accident or because of lack of care or negligence. Under such circumstances, it was concluded that if the injury to the plaintiff flowed from the continued operation of the defendant's plant without safeguards, the operation was deliberate.

▆▆▆ Under all the authorities brought to the attention of the Court, including those referred to above, it is firmly established that there is no liability for the unintentional invasion of the lands of another unless the invasion is caused by negligent, reckless or ultrahazardous conduct. For example, in Restatement of the Law of Torts, § 822(m), it is stated:

"There is no general rule of law that one acts at his peril in respect to interference with another's use or enjoyment of his land, and therefore when such interferences are purely accidental the actor is not liable for causing them. It is only when unintentional invasions are caused by another's conduct which is negligent, reckless or ultrahazardous that the law subjects the actor to the liability."

And in Section 825(a) of the same treatise, it is stated:

"It is the knowledge which the actor has at the time he acts or fails to act that determines whether the invasion which results from his conduct is intentional or unintentional. It is not enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing such an invasion. He must either act for the purpose of causing it or know that it is resulting or is substantially certain to result from his conduct."

With the above principles of law in mind, we turn now to a consideration of the conduct of the defendant which resulted in the damages sustained by the plaintiff. From 1954 until the summer of 1962, the defendant operated its finishing plant in the vicinity of the plaintiff's store. During this entire period, the defendant used synthetic varnishes and lacquers containing urea-formaldehyde in finishing small quantities of its products, and exhausted the fumes from the roof of its building. When the defendant moved its finishing plant across Carolina Avenue in the summer of 1962, it continued its finishing operations in the identical manner as these operations had earlier been carried on. At no time did the defendant receive any complaint from the plaintiff or any residents of the area

with respect to the fumes and odors being exhausted from its plant. The only change whatever which the defendant made in the operation of its finishing plant, including the materials used in its finishing process, after the removal, was the installation of a make-up air unit during the latter part of 1962. This unit did not exhaust any fumes from the building that had not been exhausted earlier, and the only effect the unit had, particularly insofar as the plaintiff and the other residents of the area were concerned, was to dissipate the fumes over a wider area. There was no credible evidence that the method employed by the defendant to finish its products, including the method used to exhaust fumes from its finishing plant, both before and after the installation of the make-up air unit, was not a method commonly used in the trade. The defendant was operating a legitimate business and, so far as is disclosed by the evidence, was operating its business in strict compliance with all applicable municipal and other governmental rules and regulations. The plaintiff did not associate the difficulties he was experiencing in his store with the activities of the defendant, and the defendant had no knowledge of the plaintiff's odor problems until February 1, 1963, three days before the plaintiff closed his store. The presence of formaldehyde gas in the atmosphere was not discovered until the week of February 11, 1963, more than a week after the plaintiff had discontinued his business. If the defendant was creating a nuisance, there was never any request that the nuisance be abated. No odor problem has been experienced in the community since about two weeks after the plaintiff closed his store, and the defendant has at all times continued to operate its business in the same manner as before.

 Any nuisance created by the defendant must be classified as unintentional. There is no evidence to support a finding that the defendant operated its business in an unreasonable manner, or that its conduct was negligent, reckless or ultrahazardous. The defendant had no way of knowing or being substantially certain that the method employed to finish its products, and to exhaust fumes from its plant, would cause harm to the plaintiff or others in the area. While it has been found that the urea-formaldehyde fumes exhausted from the defendant's plant resulted in the plaintiff having to close his business and suffer a substantial monetary loss, this unfortunate occurrence was not foreseeable by the defendant and was purely accidental. Under such circumstances, no legal liability attaches to the defendant for the damages sustained by the plaintiff.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The defendant was not guilty of any intentional, unreasonable, negligent, reckless or ultrahazardous conduct which resulted in the creation of the nuisance complained of.

3. The plaintiff is entitled to recover nothing of the defendant, and the complaint should be dismissed with prejudice.

A judgment will be entered accordingly.