WANDA JORDAN, CHRISTINE JORDAN, PAUL JORDAN, BY AND THROUGH HIS GUARDIAN AD LITEM JOEL WINSTON, AND DIANNE KEHRLE, PLAINTIFFS v. FOUST OIL COMPANY, INC., WILFRED PHELPS, AND NANCY PHELPS, DEFENDANTS

No. 9315SC501

(Filed 6 September 1994)

1. **Gas and Oil § 40 (NCI4th)— delivery of gas—leaking underground storage tanks—summary judgment for defendant—erroneous**

The trial court erred by granting summary judgment for defendant Foust Oil Company on a claim for violation of the Oil Pollution and Hazardous Substances Control Act where the forecast of evidence showed that gas was transported from Foust's plant to Phelps Store by tanker and pumped from the truck into underground storage tanks; gas from the store's UST then entered groundwater drawn into plaintiff's wells, resulting in injuries to

plaintiffs' property and persons; the delivery man stated that Mr. Phelps had informed him that Tank 1 was leaking and that he made no further deliveries to that tank; the delivery man also stated that he had tested tanks 2 and 3, which were connected, determined that there was a shortage in tanks 2 and 3 that could indicate a leak, and refused to make further deliveries to those tanks; and plaintiffs presented invoices and loading tickets for deliveries made to Phelps from which it could be inferred that Foust pumped gasoline into leaking tanks 1, 2, 3, or 5. This evidence presents a genuine issue of material fact.

**Am Jur 2d, Electricity, Gas, and Steam §§ 211 et seq., 244 et seq.; Gas and Oil §§ 228 et seq.**

**Liability of one selling or distributing liquid or bottled fuel gas, for personal injury, death, or property damage. 41 ALR3d 782.**

2. **Gas and Oil § 40 (NCI4th)— leaking underground storage tanks—liability of dealer making delivery—ownership interest**

A gasoline supplier like defendant Foust Oil Company may be found to have "control over" gasoline discharged from an unsound underground storage tank it filled but does not own. Although defendant argued that it cannot be found in control after possession and ownership of the gasoline have passed to the store to which the gasoline is delivered unless it had an ownership interest in the tanks or the store or was obligated to service, monitor, or repair the tanks, statutory "control over" oil is not necessarily coextensive with physical control or possession of oil or ownership of oil at the time of its discharge. In defining "having control over" oil, the Legislature expressly included storing or transporting oil "immediately prior" to a discharge of such oil, so that Foust can be found to have control over the gasoline even though it relinquished ownership and possession of the oil after its discharge. The Legislature clearly intended to provide broad protection of the land and waters of North Carolina from pollution by oil and other hazardous substances and to thereby promote the health, safety, and welfare of the citizens of this state; liability for damages caused to persons and property by unlawful discharges is broadly and strictly imposed on "[a]ny person hav-

JORDAN v. FOUST OIL COMPANY

[116 N.C. App. 155 (1994)]

ing control over" such oil or other hazardous substances. N.C. Gen. Stat. § 143-215.93.

**Am Jur 2d, Electricity, Gas, and Steam §§ 211 et seq., 244 et seq.; Gas and Oil §§ 228 et seq.**

**Liability of one selling or distributing liquid or bottled fuel gas, for personal injury, death, or property damage. 41 ALR3d 782.**

3. **Trespass § 46 (NCI4th)— leaking underground storage tanks—trespass—summary judgment**

   The trial court erred by granting summary judgment for defendant Foust Oil Company on a trespass claim arising from leaking underground storage tanks owned by a third party to which Foust had delivered gasoline. The evidence forecast in this case was that plaintiffs possessed the land at the time gasoline from the storage tanks leaked into their well water and that Foust delivered gasoline several times into the tanks when it knew or should have known the tanks were leaking.

   **Am Jur 2d, Trespass § 16.**

4. **Nuisance § 11 (NCI4th)— leaking underground storage tanks—summary judgment**

   The trial court erred by granting summary judgment for defendant Foust Oil Company on a nuisance action arising from leaking underground storage tanks owned by a third party to which Foust had delivered gasoline where the forecast of evidence raises genuine issues as to plaintiffs' loss of use and enjoyment of their property and as to whether Foust unreasonably interfered with plaintiffs' use of their land by knowingly delivering gasoline into leaking tanks.

   **Am Jur 2d, Nuisances §§ 1-4, 43-48.**

Appeal by plaintiffs from order of Judge E. Lynn Johnson signed 26 August 1992 in Orange County Superior Court. Heard in the Court of Appeals 10 February 1994.

*Berman & Shangler, by Dean A. Shangler, for plaintiff appellants.*

*Coleman, Gledhill & Hargrave, by Kim K. Steffan and Mark T. Sheridan, for defendant appellee, Foust Oil Company, Inc.*

JORDAN v. FOUST OIL COMPANY

[116 N.C. App. 155 (1994)]

COZORT, Judge.

Since 30 March 1990, the Jordan family, plaintiffs herein, have lived in a home on N.C. Highway 86 North in Hillsborough. Beginning about 1983 defendants Wilfred and Nancy Phelps operated the Phelps Store, a convenience store-gas station-restaurant, located near the plaintiffs' home, where they sold gasoline pumped from underground gasoline storage tanks (UST's). There were five underground gasoline storage tanks at the Phelps Store and one pump island with three gasoline pumps. The defendant Foust Oil Company, Inc., transported gasoline by tanker truck to Phelps Store several times each week and filled Phelps Store UST's with gasoline. Foust also provided, maintained and serviced the gasoline pumps used at Phelps Store and conducted inventory control tests on Phelps Store UST's to detect possible leaks and shortages.

In early October of 1990, plaintiffs noticed their well water had a foul taste and smell. Plaintiffs contacted the Division of Environmental Management of the North Carolina Department of Environment, Health and Natural Resources (DEHNR). DEHNR took water samples from plaintiffs' well and their neighbors' wells. Gasoline was found in these samples. The state toxicologist tested plaintiffs' water and prepared a health risk evaluation of plaintiffs' well water which stated that the samples indicated extensive gasoline contamination. Specifically, the evaluation stated:

> Benzene levels are 62 times the EPA MCL of 5 ppb, with high levels of other products detected. Benzene is a known human carcinogen. *Any* continued water use from this well for *any* purposes may pose a significantly increased long-term cancer risk. It is strongly recommended that all use of water from this well be discontinued immediately.

On 26 November 1990, DEHNR obtained soil samples from the Phelps Store property and, on 10 December 1990, confirmed a release of petroleum products from the Phelps Store UST's. Wilfred Phelps was notified of this and of his consequent violation of N.C. Gen. Stat. § 143-215.75 *et. seq.* On 10 December 1990, DEHNR also received results of tests done on additional water samples collected from plaintiffs' and plaintiffs' neighbors' wells. The results showed contaminant levels had risen dramatically over the dangerous levels found previously.

JORDAN v. FOUST OIL COMPANY

[116 N.C. App. 155 (1994)]

Foust made no further deliveries of gasoline to the Phelps Store after 15 November 1990, and in December of 1990 Foust removed the pumps from the Phelps Store. DEHNR later removed the Phelps Store UST's from the ground and discovered holes in the bottom of the largest tank. The investigator who removed and inspected the UST's stated:

> [G]asoline was probably released from one or more [UST's] at Phelps Grocery beginning before October 31, 1990; that the constituents of gasoline found in water pumped from both the Jordan and Long wells in October, 1990, and thereafter were probably from gasoline released from the underground tank systems at Phelps Grocery; and that, as a result of the probable release of gasoline from the underground tank systems at Phelps Grocery, water drawn from the Jordan and Long wells was contaminated with constituents of gasoline, including benzene.

Plaintiffs discontinued drinking their well water after noticing the foul odor, but continued to use it for other purposes for several weeks, when they were informed of the significant health risk posed by their water and advised not to use their water for anything. Before they stopped using the water, plaintiffs suffered skin redness and irritation, headaches, nausea, and dizziness.

Plaintiffs sued Wilfred and Nancy Phelps and Foust Oil Company, Inc., in April 1991. None of the claims involving the Phelpses are before us. From this point on, "defendant" shall refer to Foust Oil Company, Inc. Plaintiffs alleged that Foust Oil Company violated the Oil Pollution and Hazardous Substances Control Act [OPHSCA]. Plaintiffs also alleged claims for trespass, infliction of emotional distress, unfair trade practice, and nuisance. Defendant answered in August of 1991 and moved for summary judgment on 10 July 1992. On 17 August 1992, plaintiffs took a voluntary dismissal on the claims of infliction of emotional distress. On 26 August 1992, Judge E. Lynn Johnson signed an order granting summary judgment for Foust on all "remaining claims." Plaintiffs appeal.

[1] We first review the grant of summary judgment on the plaintiffs' claim for violation of OPHSCA. Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (1990). After reviewing the record, we conclude that there was a gen-

uine issue of material fact as to whether Foust is liable under OPHSCA for delivering gas to the leaking tanks.

N.C. Gen. Stat. § 143-215.83 (1993), North Carolina's Oil Pollution and Hazardous Substances Control Act, states, in pertinent part:

> It shall be unlawful, except as otherwise provided . . . for any person to discharge, or cause to be discharged, oil or other hazardous substances into or upon any waters . . . within this State, . . . regardless of the fault of the person having control over the oil or other hazardous substances . . . .

N.C. Gen. Stat. § 143-215.93 (1993) provides, in pertinent part:

> Any person having control over oil or other hazardous substances which enters the waters of the State in violation of this Part shall be strictly liable, without regard to fault, for damages to persons or property . . . caused by such entry . . . .

Pursuant to § 143-215.77(8), gasoline is "oil." "Waters" is broadly defined under § 143-215.77(18) as: "any stream, river . . . or any other body or accumulation of water, surface or underground, public or private, natural or artificial, which is contained within, flows through, or borders upon this State . . . ." Thus, plaintiffs' well water constitutes "waters of the State" under § 143-215.93. The phrase "Having control over oil or other hazardous substances" is defined as:

> "Having control over oil or other hazardous substances" shall mean, but shall not be limited to, any person, using, transferring, storing, or transporting oil or other hazardous substances immediately prior to a discharge of such oil or other hazardous substances onto the land or into the waters of the State, and specifically shall include carriers and bailees of such oil or other hazardous substances.

N.C. Gen. Stat. § 143-215.77(5).

The forecast of evidence showed that gas was transported from Foust's plant in Mebane to Phelps Store by tanker truck and pumped from the truck into the UST's. Gas from the store's UST's then entered groundwater drawn into plaintiffs' wells, resulting in injuries to plaintiffs' property and persons. There were five tanks with varying capacities. Defendant admitted that he delivered gasoline to certain UST's at the Phelps property, but defendant denied the existence of leaks in those UST's.

JORDAN v. FOUST OIL COMPANY

[116 N.C. App. 155 (1994)]

Plaintiffs deposed Foust's delivery man, Larry Poole. Mr. Poole stated that when he began delivering to Mr. Phelps, Mr. Phelps informed him that Tank 1 was leaking. Mr. Poole further testified that he made no deliveries to Tank 1. Mr. Poole also testified that in September 1989, he tested tanks 2 and 3, which were connected, and determined that there was a shortage in tanks 2 and 3 that could indicate a leak. He then informed Phelps of this and refused to make further deliveries to tanks 2 and 3. Thereafter, Mr. Poole made deliveries only to tanks 4 and 5.

To rebut Mr. Poole's testimony, plaintiffs presented invoices and loading tickets for deliveries made to Phelps, from which it could be inferred that Foust pumped gasoline into leaking tanks 1, 2, 3, or 5. The invoices showed the amount of gas and types of gas delivered to Phelps' UST's. On 26 September 1989, Foust delivered 2743 gallons of gas to tanks 2, 3, 4 and 5. Since the total available combined capacity of these tanks was 2500 to 2600 gallons, it is reasonable to infer that the remaining gallons were put into tank 1. On 30 September 1989, after Foust knew that tanks 2 and 3 had developed a shortage and were possibly leaking, Foust delivered 2560 gallons of gasoline to Phelps. Since tanks 4 and 5 had a combined capacity of 1500, the remaining 1069 gallons delivered on 30 September 1989 were, drawing inferences against movant Foust, pumped into tanks 1, 2, or 3, or some combination of the three. On 25 May 1990, 8 June 1990, and 29 June 1990, Foust pumped 1185, 1150, and 1100 gallons, respectively, of Exxon Plus into Phelps' tanks. Foust averred that since September 1989, Exxon Plus was delivered only to the 1000 gallon capacity tank 5, and that premium grade gasoline was put into tank 4 only. Drawing inferences from this evidence in favor of plaintiffs, on 25 May 1990, 8 June 1990, and 29 June 1990, Foust delivered some Exxon Plus into tanks 1, 2, or 3, or some combination thereof. On 20 September 1990, Foust delivered 250 gallons of Exxon Supreme, 900 gallons of Exxon Regular, and 650 gallons of Exxon Plus. Assuming that Foust, as it has sworn, delivered the Exxon Plus into the 1000 gallon tank 5 and the Exxon Supreme into 500 gallon tank 4, it may be inferred that on 20 September 1990 Foust put 900 gallons of Exxon Regular into some or all of tanks 1, 2, and 3.

We find this evidence presents a genuine issue of material fact as to Foust's strict liability under OPHSCA.

[2] Defendant argues that since it did not own or possess the gas after it delivered it into the UST's, had no ownership interest in the

UST's or the Phelps Store, and had no obligation to Phelps to service, monitor, or repair the tanks, it did not have "control over" the gasoline. The substance of defendant's argument is that after possession and ownership of the gasoline have passed to the Phelps Store, Foust cannot be found in control unless plaintiffs can establish that Foust had an ownership interest in the UST's or in the Phelps Store or that Foust was obligated to service, monitor, or repair the tanks for Phelps. We disagree. Looking at the plain language of N.C. Gen. Stat. § 143-215.77(5), Foust may be found to have had control over the gasoline because it transported the gasoline immediately prior to its discharge.

Statutory "control over" oil is not necessarily coextensive with physical control or possession of oil or ownership of oil at the time of its discharge. Since carriers and bailees are expressly included in the definition of "having control over," one need not have an ownership interest in oil to "have control over" it. That "having control over" oil may be distinct from "owning" oil is suggested by the use of these two terms in the disjunctive in § 143-215.85:

> Every person owning *or* having control over oil or other substances discharged in any circumstances . . . shall immediately notify the [DEHNR] . . . .

N.C. Gen. Stat. § 143-215.85 (emphasis added). Moreover, in defining "having control over" oil, the Legislature expressly included storing or transporting oil "immediately prior" to a discharge of such oil. Thus, Foust can be found to have control over the gasoline even though it relinquished ownership and possession of the oil after its discharge. If the UST's Foust delivered into were unsound, and gasoline leaks out as or immediately after it is pumped in, Foust had statutory "control over" the discharged gasoline and is, under § 143-215.93, strictly liable for damages caused by entry of the gasoline into soil and water.

Defendant contends that an application of the basic principles of statutory construction to the language contained in Parts 1, 2, and 2A of OPHSCA yields a different conclusion. Defendant argues the Legislature intended that, with regard to discharges from underground storage tanks, persons "having control" over the gasoline immediately prior to discharge are those persons who come within the definition of "owner" and "operator," as those terms are defined in Part 2A. We disagree.

"In matters of statutory construction, the task of the courts is to ensure that the purpose of the Legislature, the legislative intent, is accomplished. The best indicia of that legislative purpose are the language of the act and what the act seeks to accomplish." *Wagoner v. Hiatt*, 111 N.C. App. 448, 450, 432 S.E.2d 417, 418 (1993) (citation omitted). "A court should always construe the provisions of a statute in a manner which will tend to prevent it from being circumvented. If the rule were otherwise, the ills which prompted the statute's passage would not be redressed." *Campbell v. First Baptist Church of Durham*, 298 N.C. 476, 484, 259 S.E.2d 558, 564 (1979) (citation omitted).

" 'Statutes *in pari materia* are to be construed together, and it is a general rule that the courts must harmonize such statutes, if possible, and give effect to each, that is, all applicable laws on the same subject matter should be construed together so as to produce a harmonious body of legislation, if possible.' " *Justice v. Scheidt, Commissioner of Motor Vehicles*, 252 N.C. 361, 363, 113 S.E.2d 709, 711 (1960) (quoting *Blowing Rock v. Gregorie*, 243 N.C. 364, 371, 90 S.E.2d 898, 904 (1956)).

The purpose of the Oil Pollution and Hazardous Substances Control Act, as set out in N.C. Gen. Stat. § 143-215.76, is "to promote the health, safety, and welfare of the citizens of this State by protecting the land and the waters over which this State has jurisdiction from pollution by oil, oil products, oil by-products, and other hazardous substances."

To accomplish this purpose, Part 2 of OPHSCA contains various provisions to control the discharge of oil. Part 2 defines unlawful discharges of oil and provides for the removal of such discharges by "[a]ny person having control over oil or other hazardous substances . . . ." N.C. Gen. Stat. §§ 143-215.83, -215.84 (1993). "Having control over oil or other hazardous substances" is expressly and broadly defined in § 143-215.77(5). Section 143-215.83(b) excepts certain discharges from the unlawful discharge provision. We note that § 143-215.83(b) excepts an act or omission of a third party. Since the parties have not addressed this section, we do not comment on whether this exception applies. Part 2 also requires persons "owning or having control over oil or other substances discharged" to immediately notify the Department when it becomes aware of certain unpermitted discharges. N.C. Gen. Stat. § 143-215.85. Part 2 deters discharges of oil and hazardous substances by imposing civil and

criminal penalties, imposing liability for damage to public resources, and imposing strict liability on persons "having control over oil or other hazardous substances" for damages to persons or property, public or private, caused by discharges in violation of Part 2. *See* N.C. Gen. Stat. §§ 143-215.88A, -215.88B, -215.90, -215.93. Section 143-215.93, which imposes strict liability for damages to persons or property, is subject to the exceptions enumerated in § 143-215.83(b).

The "Leaking Petroleum Underground Storage Tank Cleanup" portion of OPHSCA provides additional mechanisms to protect the land and waters of North Carolina. It places a duty on owners and operators of UST's in North Carolina to notify DEHNR upon a determination that a discharge of petroleum from a UST has occurred and to immediately undertake to collect and remove the discharge. N.C. Gen. Stat. § 143-215.94E(a). With regard to tanks in operation on or after 8 November 1984, "owner" is defined as "any person who owns an underground storage tank used for storage, use or dispensing of petroleum products . . . ." N.C. Gen. Stat. § 143-215.94A(9)(a). With regard to tanks in use prior to 8 November 1984, but no longer in use afterwards, "owner" is defined as "any person who owned such tank immediately before the discontinuation of its use." N.C. Gen. Stat. § 143-215.94A(9)(b). "Operator" is defined as "any person in control of, or having responsibility for, the operation of an underground storage tank." N.C. Gen. Stat. § 143-215.94A(8). Part 2A establishes Commercial and Noncommercial Leaking Petroleum Underground Storage Tank Cleanup Funds. N.C. Gen. Stat. §§ 143-215.94B, -215.94D. Section 143-215.94C requires owners and operators of commercial petroleum UST's to contribute to the Commercial Fund by paying an annual operating fee. N.C. Gen. Stat. § 143-215.94C. Section 143-215.94B(5) provides that "third parties" who have incurred "bodily injury and property damage in excess of one hundred thousand dollars ($100,000)" as a result of leaking UST's shall be paid from the Commercial Fund.

In enacting Part 2 of OPHSCA, the Legislature clearly intended to provide broad protection of the land and waters of North Carolina from pollution by oil and other hazardous substances and to thereby promote the health, safety, and welfare of the citizens of this state. Liability for damages caused to persons and property by unlawful discharges is broadly and strictly imposed on "[a]ny person having control over" such oil or other hazardous substances. N.C. Gen. Stat. § 143-215.93. We disagree with defendant's contention that in enacting the "Leaking Petroleum Underground Storage Tank Cleanup" part of

OPHSCA, the Legislature made clear its view that owners and operators of UST's, as those terms are defined, are the persons with "control over" the petroleum products stored inside them. We cannot construe the provisions of OPHSCA in this manner because it would narrow the statute's broad reach and thereby thwart the Legislature's intent. Moreover, "[h]aving control over oil or other hazardous substances" is expressly and broadly defined in § 143-215.77(5). " '[W]hen a statute contains a definition of a word or term used therein, such definition, unless the context clearly requires otherwise, is to be read into the statute wherever such word or term appears therein.' " *Campos v. Flaherty*, 93 N.C. App. 218, 222, 377 S.E.2d 282, 283 (1989) (quoting *Smith v. Powell, Commissioner of Motor Vehicles*, 293 N.C. 342, 345, 238 S.E.2d 137, 140 (1977)).

Although there are no cases holding a "bare supplier" liable under OPHSCA, our decision is supported in part by the recent Supreme Court case of *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 398 S.E.2d 586 (1990). In *Wilson*, plaintiffs argued third-party defendant Alamance Oil Company, Inc. (Alamance), was liable under N.C. Gen. Stat. § 143-215.93. *Id.* In *Wilson*, there were two pieces of property involved on which UST's had been located and from which, at various times, gasoline had been sold, the Mini-Mart and the Warren properties. Alamance had involvement with both. *Id.* at 500-02, 398 S.E.2d at 589-91.

The Baxters bought the Mini-Mart property on 7 May 1965 and owned it until 26 January 1976. *Id.* at 500, 398 S.E.2d at 589. There were several UST's on the property when the Baxters bought it; they claimed these were the property of Alamance. Alamance claimed the UST's were part of the real property. Until 1974, the Baxters sold gasoline purchased from Alamance. *Id.* Alamance last delivered gasoline to the Baxters on 5 April 1974. *Id.* at 500, 398 S.E.2d at 590.

Alamance owned the Warren property from January 1958, to 21 September 1971. After Alamance sold the property to Warren, it provided gasoline to the Warren UST's until March 1973. *Id.* at 502, 398 S.E.2d at 591.

In analyzing whether plaintiffs' claim against Alamance was barred by the 10-year statute of repose, N.C. Gen. Stat. § 1-52(16) (Cum. Supp. 1993), the court reasoned:

Assuming *arguendo* that Alamance fits the definition of one "having control over" the gasoline, the forecast of evidence does not show that Alamance had "control" over the gasoline, in the lan-

guage of the statute, less than ten years prior to the time this action was filed. Thus, Alamance had no "control" over the tanks at the Mini-Mart property after it was sold to Simmons on 26 January 1976, more than ten years before plaintiffs filed this action. The forecast of evidence shows that Alamance had no ownership of the tanks at the Warren property after it sold the property to J.R. Warren on 21 September 1971. Since Alamance had no ownership of the tanks at the Warren property, *its last act was its last delivery of gasoline in March 1973*, more than ten years before plaintiffs filed this action.

*Wilson*, 327 N.C. at 514, 398 S.E.2d at 598 (emphasis added).

The Court, thus, in assuming for the sake of argument that Alamance fit the definition of having control over the gasoline discharged at the Mini-Mart and Warren sites, identifies the events from which "control" could arise in order to determine whether any such event had occurred within ten years of the filing of the action. These events are owning property in which UST's are buried, owning the UST's, or delivering gasoline into UST's which Alamance did not own. This suggests that a supplier like Foust may be found to have "control over" gasoline discharged from an unsound UST it filled but does not own.

[3] We next review the grant of summary judgment on the plaintiffs' claims for trespass and nuisance. In *Biddix v. Henredon Furniture Industries*, 76 N.C. App. 30, 40, 331 S.E.2d 717, 724 (1985), this Court recognized plaintiff's private right of action for common law nuisance and trespass based upon a violation of N.C. Gen. Stat. § 143-215.93, notwithstanding the statutory enactment of the Clean Water Act.

The elements of a trespass claim are that plaintiff was in possession of the land at the time of the alleged trespass; that defendant made an unauthorized, and therefore unlawful, entry on the land; and that plaintiff was damaged by the alleged invasion of his rights of possession. *Matthews v. Forrest*, 235 N.C. 281, 283, 69 S.E.2d 553, 555 (1952). The evidence forecast in this case was that plaintiffs possessed the land at the time gasoline from Phelps Store UST's seeped into their well water. Plaintiffs also forecast evidence that Foust delivered gasoline several times into Phelps Store UST's when it knew or should have known the tanks were leaking. We conclude this was sufficient evidence to withstand defendant's motion for summary judgment.

**JORDAN v. FOUST OIL COMPANY**

[116 N.C. App. 155 (1994)]

Defendant contends that summary judgment was proper because to commit a trespass, defendant must have legal responsibility for the person or thing that went onto the plaintiffs' land. Defendant argues that Phelps was solely responsible for any unauthorized seepage because Phelps, not Foust, controlled the gasoline from the time of delivery. We disagree. The plaintiffs produced evidence that defendant delivered gasoline several times into tanks it knew or should have known were leaking. This tends to show some legal responsibility on Foust's part for the unauthorized seepage and supports the claim of trespass.

[4] To recover in nuisance, plaintiffs must show an unreasonable interference with the use and enjoyment of their property. *Kent v. Humphries*, 303 N.C. 675, 677, 281 S.E.2d 43, 45 (1981). Since the evidence forecast raises genuine issues as to plaintiffs' loss of use and enjoyment of their property, and as to whether Foust unreasonably interfered with plaintiffs' use of their land by knowingly delivering gasoline into leaking tanks, we conclude that summary judgment was also improperly granted on plaintiffs' nuisance claim.

Plaintiffs also contended in their brief and at oral argument that the trial court erred by granting summary judgment on plaintiffs' claim for negligence. Our review of the complaint discloses no claim alleging negligence. We therefore decline to consider this portion of plaintiffs' argument.

In summary, we find the trial court erred in granting summary judgment for defendant Foust on plaintiffs' claims for (1) violations of OPHSCA, (2) trespass and (3) nuisance. The cause is remanded for further proceedings on those claims.

Reversed and remanded.

Judges ORR and GREENE concur.