**Margaret Long RUDD, Plaintiff,**

v.

**ELECTROLUX CORPORATION, et al., Defendants.**

**No. 2:94CV00640.**

United States District Court, M.D. North Carolina.

Nov. 6, 1997.

Leonard A. Colonna, Joseph Francis McNulty, Jr., Robert A. Ford, Melissa Robin Davis, Tuggle Duggins & Meschan, P.A., Greensboro, NC, for plaintiff.

F. Hill Allen, IV, L. Neal Ellis, Jr., Matthew Patrick McGuire, Hunton & Williams, Raleigh, NC, for defendants.

### ORDER

ELIASON, United States Magistrate Judge.

Plaintiff Margaret Long Rudd ("Rudd") originally filed this action in state court alleging that groundwater on her property became contaminated through migration from adjoining property owned now or in the past by defendants. As defendant, Rudd named Electrolux Corporation, d/b/a Lawrence Industries ("Electrolux"). After Electrolux removed the case to this Court, plaintiff amended her complaint to allege identical state law causes of action against defendant SLE, Inc. ("SLE") a former owner of the Electrolux property. No federal law claims are involved. The Court's jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. The parties have filed cross-motions for summary judgment.

Plaintiff alleges five state law causes of action against the defendants. The first asserts a discharge of a hazardous substance in violation of North Carolina's Oil Pollution and Hazardous Substances Control Act of 1978 ("OPHSCA"), N.C.Gen.Stat. § 143–215.75, et seq. This is a strict liability statute. Plaintiff next alleges that OPHSCA and related water quality regulations establish a duty of care, the violation of which constitutes negligence per se. Plaintiff then asserts causes of action for trespass and nuisance as a result of the migration and the threat of migration of material from defendants' land to plaintiff's. The fifth cause of action alleges negligent keeping and control of underground storage tanks (UST's) which permitted the leaks into the ground water. Plaintiff wants damages, and declaratory and injunctive relief with respect to future costs, remedial work, clean-up, etc.

### Undisputed Material Facts

Plaintiff owns approximately 66 acres of undeveloped land. The Electrolux property is adjacent to that land and was owned by Sara Lee Corporation from 1975 through 1980. In 1980, SLE obtained ownership of the property. Defendant SLE is or was a wholly owned subsidiary of Sara Lee and operated the manufacturing facility on the property through 1987, when ownership of the property was transferred to Electrolux, the present owner.

A manufacturing facility on the Electrolux property opened in approximately 1974.[1] In 1976, two UST's were installed on the property for the storage of two solvents, i.e., toluene and 1,1,1–trichloroethane ("TCA"). The UST's remained in use until early 1989 and then were removed in July or August 1990. On removal, there was evidence of a hole in the toluene tank and a strong order of both toluene and TCA at the site and near the fill pipe. Soil samples yielded a report of both TCA and toluene. In addition, the following contaminants were found at amounts exceeding the allowable concentration level under North Carolina's Ground Quality Standards, N.C.Admin.Code tit. 15A, r. 2L .0202 (1979): TCA, 1,1–dichloroethene ("DCE"), trichloroethene, chloroform, vinyl chloride, methylene chloride, chloromethane, and benzene. Additional contaminants found were

---

1. Electrolux still owns the Electrolux property, but ceased manufacturing activities on the site at the end of 1994. Another business entity, Lawrence Industries Acquisition, took over the manufacturing operations under a lease-sale agreement.

1,1–dichloroethane ("DCA"), toluene, acetone, carbon disulfide and tetrachloroethane.

■ As a result of the contamination, the North Carolina Department of Environment, Health, and Natural Resources issued a violation notice and required Electrolux to conduct site assessment and corrective action. Compliance revealed that groundwater on the Electrolux property flowed from the UST's toward the Rudd property. Twenty-seven monitoring wells and seven recovery wells have been installed on the Rudd property. The following contaminants have been determined to exist: TCA, DCE, DCA, chloroform, carbon disulfide, and acetone. Of these, only the DCE and chloroform are at levels exceeding groundwater quality standards. Both plaintiff's and defendants' experts agree that the TCA, DCE, and DCA come from the contamination plume originating on the Electrolux property. It is undisputed that TCA breaks down into DCE and DCA and that the half-life of TCA ranges from 5 months to 1.5 years. (Henry Dep. at 91) Plaintiff fails to connect the chloroform to the contaminant plume coming from the Electrolux property.[2]

This Court has entered a preliminary injunction against Electrolux requiring it to investigate the extent of the contamination, remediate the Rudd land in accordance with North Carolina Law, and provide a $800,000 letter of credit as surety.

Defendants SLE and Electrolux seek summary judgment dismissal of all of plaintiff's claims, and alternatively, seek rejection of plaintiff's claims for stigma and lost opportunity damages. Defendant SLE presents a sixth issue pertaining solely to it requesting dismissal of the entire complaint on the ground that plaintiff cannot prove that any illegal discharge of contaminants took place while it owned the land.

Plaintiff has filed a motion for partial summary judgment and the entry of a permanent injunction, presenting four issues for review. She seeks the entry of judgment determining defendants' liability as to her OPHSCA, negligence per se, and trespass claims. To the extent these issues implicate defendants' motions, the Court will consider the motions together. Plaintiff's fourth issue requests the entry of a permanent injunction against both defendants requiring them to investigate and remediate the contamination of the Rudd property and to post adequate security. This assumes the Court will grant her partial summary judgment motion.

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990). When opposing a properly supported motion for summary judgment, the party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. *Id.* The mere fact that both parties request summary judgment does not necessarily mean that the material facts are undisputed. *World–Wide Rights, Ltd. Partnership v. Combe, Inc.*, 955 F.2d.242, 244 (4th Cir.1992).

■ Because all of plaintiff's claims arise under North Carolina law, special rules apply. When state law is unclear, the federal court must rule in such a manner as it appears the highest state court would rule if presented with the issue. Where the state's highest court has not decided the particular issue, the federal court should examine the rulings of the lower state courts. Rulings of the lower courts may be considered as persuasive evidence of state law, but they are not binding on the federal court should it be convinced the highest court would rule to the contrary. *Sanderson v. Rice*, 777 F.2d 902, 903 (4th Cir.1985), *cert. denied*, 475 U.S.

---

**2.** Because plaintiff has failed to connect the chloroform with the contaminant plume migrating from defendants' property, she has failed to establish causation on any of her claims regarding chloroform and those claims must be dismissed.

*Ammons v. Wysong & Miles Company*, 110 N.C.App. 739, 745–747, 431 S.E.2d 524, 528–529, *rev. denied*, 334 N.C. 619, 435 S.E.2d 332 (1993).

1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986). Furthermore, the federal court must rule on state law as it exists, as opposed to surmising or suggesting an expansion of state law. *Burris Chemical, Inc. v. USX Corp.*, 10 F.3d 243 (4th Cir.1993).

### Issue Number One

Are plaintiff or defendants entitled to summary judgment on Count One alleging violation of OPHSCA?

Plaintiff's first alleged claim for relief arises under the strict liability provisions of OPHSCA. With some exceptions which are not relevant to this case, OPHSCA makes it unlawful

for any person to discharge, or cause to be discharged, oil or other hazardous substances into or upon any waters, tidal flats, beaches, or lands within this State, or into any sewer, surface water drain or other waters that drain into the waters of this State, regardless of fault of the person having control over the oil or other hazardous substances, or regardless of whether the discharge was the result of intentional or negligent conduct, accident or other cause.

N.C.Gen.Stat. § 143–215.83. Plaintiff alleges that defendants' release of TCA and/or its conversion to DCE is a violation of this statute for which defendants are strictly liable.

The parties agree that defendants controlled TCA in a UST which leaked into the surrounding soil and groundwater, and that this TCA, along with its breakdown products (including DCE), migrated onto plaintiff's property. With the basic events clearly established, the only remaining disputes between the parties concern whether or not those events constitute a violation of OPHSCA.

In their motion for summary judgment, defendants advance two arguments, either of which, if successful, would absolve them of liability under OPHSCA. Their first contention is that they never leaked a substance which has been designated "hazardous" under OPHSCA. In the event that the Court should find that defendants did release a "hazardous substance," defendants secondly argue that plaintiff has failed to prove that they released that substance in sufficient quantities to constitute a "discharge" under OPHSCA. Defendants' arguments hinge almost entirely on the definitions of "discharge" and "hazardous substance" as set forth in North Carolina General Statute § 143–215.77 and the statutes and regulations to which it refers.

Subsection (5a) of Section 143–215.77 provides a general definition of "hazardous substance" as "any substance, other than oil, which when discharged in any quantity may present an imminent and substantial danger to the public health or welfare, as designated pursuant to G.S. 143–215.77A." Turning to North Carolina General Statute § 143–215.77A(a), one finds that it specifically identifies as "hazardous substances" "[t]hose substances designated as hazardous as of June 1, 1980, by the Administrator of the United States Environmental Protection Agency under 33 U.S.C. [§ ] 1321(b)(2)(A) are designated as hazardous substances for the purposes of this Article."

Following the statutory trail to 33 U.S.C. § 1321(b)(2)(A), one comes to the Clean Water Act which sets federal controls on oil and hazardous substance pollution. This section of the Act requires the head of the Environmental Protection Agency (EPA) to

develop, promulgate, and revise as may be appropriate, regulations designating as hazardous substances, other than oil as defined in this section, such elements and compounds which, when discharged in any quantity into or upon [navigable waters, shoreline, Continental Shelf], or which may affect natural resources [of the United States], present an imminent and substantial danger to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches.

Acting pursuant to the command of this statute, the EPA has promulgated a list of hazardous chemicals that is set out in 40 C.F.R. § 116.4.

It is at this point that defendants begin their argument that they never released a hazardous substance. They correctly point out that TCA, the substance which they stored in their tank, is not listed in Section

116.4 and, therefore, cannot be a "hazardous substance" under OPHSCA. Plaintiff counters, also correctly, that DCE is a listed substance.[3] She contends that because the unlisted TCA released by the defendants readily degrades into listed DCE, the release of the TCA should be deemed the release of a hazardous substance. In the alternative, plaintiff argues that after the conversion, the migration of the DCE through the groundwater and onto plaintiff's property constitutes a discharge of a hazardous chemical. The issue may be a close one with support on both sides.[4] The Court declines to resolve the matter because the OPHSCA claim must be dismissed, in any event, for other reasons which are far less debatable.

■ Defendants' second argument against liability under OPHSCA is dispositive. Assuming they released a "hazardous substance," defendants contend there is no evidence that they released it in sufficient quantities to constitute a "discharge" as defined by OPHSCA. Under OPHSCA,

> "[d]ischarge" shall mean, but shall not be limited to, any emission, spillage, leakage, pumping, pouring, emptying, or dumping of oil or other hazardous substances into waters of the State, which affect lands, waters, or uses related thereto within the territorial limits of the State, or into waters outside the territorial limits of the State, or upon land in such proximity to waters that oil or other hazardous substances is reasonably likely to reach the waters, **but shall not include amounts less than quantities which may be harm-**

**ful to the public health or welfare as determined pursuant to GS 143–215.77A**

N.C.Gen.Stat. § 143–215.77(4) (emphasis added).

Like the definition for "hazardous substances," the definition of "discharge" is not a self-contained definition. It cannot be fully understood without engaging in a pinball-like journey through state and federal statutes and regulations. As emphasized above, "discharge" specifically does not include releases of amounts of hazardous substances that are less than "harmful quantities" as determined by Section 143–215.77A. *Id.* Section 215.77A(b) defines "harmful quantities" as: "[s]uch quantities of hazardous substances as may be harmful as determined as of June 1, 1980, by the Administrator of the United States Environmental Protection Agency under 33 U.S.C. [§ ] 1321(b)(4)[5] are quantities which may be harmful for purposes of this Article."

Thus, now knowing that a "discharge" means the release of harmful quantities of hazardous substances, one must look to federal regulations to learn what substances and what amounts constitute a "discharge." The President has delegated his authority under Section 1321(b)(4) to the Administrator of the EPA. Exec. Order No. 11735, 38 Fed. Reg. 21243 at § 1(1) (1973). Acting pursuant to that delegation of authority, the EPA created 40 C.F.R. § 117.1, *et seq.,* which define and set out "reportable quantities." Section 117.1(a) makes it clear that "reportable quantities" are the quantities which may be harmful. The list of reportable quantities of substances is set out in Section 117.3. This list

---

3. DCE is not listed under the names DCE or dichloroethene. Instead it is listed as vinylidine chloride.

4. The parties have presented the Court with no OPHSCA or Clean Water Act case law on this point. They have, however, presented CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.*] law which is somewhat analogous. *See United States v. New Castle County,* 769 F.Supp. 591 (D.Del.1991) (Liability possible under CERCLA, if chemical reaction which creates hazardous substance is likely to occur); *Tri–County Business Campus Joint Venture v. Clow Corp.,* 792 F.Supp. 984 (E.D.Pa.1992) (In agreement with *New Castle* ); 54 Fed. Reg. 3388 n. 2

(1989) (EPA position on CERCLA liability for unlisted substance which rapidly forms a listed one). *But see United States v. Serafini,* 750 F.Supp. 168 (M.D.Pa.1990) (CERCLA liability does not attach to unlisted substances that release hazardous substances when burned).

5. Subsection (b)(3) of the Clean Water Act, 33 U.S.C.A. § 1321(b)(3), prohibits all discharges of oil or hazardous substances except "(B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful." Subsection (b)(4) requires the President to prepare a list of quantities of hazardous substance which may be harmful when discharged.

of substances is identical to the list set out as "hazardous substances" in Section 116.4, except that it also contains quantity amounts. Therefore, the discharge of the listed quantities of the substances in Section 117.3 is a discharge in violation of 33 U.S.C.A. § 1321(b)(3).

In Section 117.3, the chemicals are assigned class letters and weights according to their class. The classes are X, A, B, C, and D with respective weights of 1, 10, 100, 1000, and 5000 pounds. TCA, the substance that defendants actually possessed in their tank, is not on the list because it is not listed under Section 116.4. However, DCE, the contaminant found in unacceptable levels on plaintiff's property is on the list. At this point, the Court will assume plaintiff can prevail on her argument that defendants are responsible for the release of a "hazardous sub-

stance" because TCA broke down into DCE and migrated onto plaintiff's land. Notwithstanding, plaintiff fails to prove a "discharge" under OPHSCA.

The current version of Section 117.3 lists DCE as a class B substance with a discharge limit of 100 pounds. Both parties refer to this version of the regulation. However, from 1980 when the amounts took effect under OPHSCA (*See* N.C.Gen.Stat. § 143–215.77A(b)) until 1990 when defendants removed their TCA tank, DCE was a class D chemical and its "reportable quantity" weight was 5,000 pounds. *See* 40 C.F.R. § 117.3 (1980–1989). Therefore, in order to survive summary judgment, plaintiff must produce some evidence that she would be able to show that defendants released a threshold amount, 100 or 5,000 pounds, of DCE. However, she never alleges or proves either.[6]

**6.** There is a further argument that reportable quantities, i.e., harmful amounts, are further circumscribed by time period limitations. Section 117.1(a) includes a reference to Section 117.21 which states that a person in charge of a facility must give notice of any discharge of a hazardous substance "in quantities equal to or exceeding in any 24–hour period the reportable quantity determined by this part." Defendants maintain that, because this reference is included in the definition of "reportable quantity," a release of a hazardous substance in excess of the amounts listed in Section 117.3 is not a release of a "reportable quantity" unless done in a 24–hour period. Plaintiff contends this definition would eviscerate the Clean Water Act. The correct interpretation is far from certain.

Even though Section 117.1 does refer to Section 117.21 in defining "reportable quantities," the reference may be simply to make readers aware that a release of the quantity listed in Section 117.3 could subject them to a reporting requirement and that they should check Section 117.21 to see if this is the case. In support of plaintiff's reading is the fact that from 1980 until 1996 the Section 117 series of regulations included a Section 117.22 which set out civil and criminal penalties for releases of hazardous substances and contained language referring to quantities "equal to or exceeding in any 24–hour period the reportable quantity established in this part." If the term "reportable quantity" itself contained a 24–hour requirement, there would be no reason for the penalty regulations to add separate 24–hour language. Further, Section 117.23, which is still valid, states that where a "reportable quantity" is discharged by a facility, the owner, operator, or person in charge will be liable for costs of removal. This section imposes liability without regard to any time period. Finally, Section 117.3 is titled "Determination of

reportable quantities." However, Section 117.3 includes only weights and neither sets out any time periods nor contains any references to Section 117.21.

Supporting defendants' reading of the "reportable quantities" definition as including "per 24 hours" is the fact that 33 U.S.C.A. § 1321(b)(3)(B) refers to time as one of the factors which should be taken into account in drafting the regulations. If no time component exists, are the weights to be read as pounds per lifetime (corporations technically live forever), per single continuous discharge, per discharge site? Also, the reportable quantities for some chemicals like DCE have changed. Without a time component, some past discharges will become legal, others illegal, by a mere change in regulations. This point is perfectly illustrated by the case at hand. From July 1, 1980 until June 30, 1990, Section 117.3 listed a reportable quantity of 5,000 pounds for DCE. On July 1, 1990, that weight changed to 100 pounds. Defendants' tanks were removed in July or August 1990. If there is no time component to "reportable quantity," then arguably, the spilling of one drop of TCA from defendants' tanks in July or August 1990 changes defendants' reportable quantity from 5,000 to 100 pounds since that one drop would be part of a single, continuous discharge. Common sense dictates that there must be some time or area component attached to the weights.

This question involves the construction of both federal regulations and state statutes which these governments regularly rely on to protect the environment. However, their interpretation and application of the regulations are not in the record and, therefore, the Court, has insufficient information for a decision. The Court need not expand the record because the matter can be decided on other grounds.

Plaintiff's entire argument is based on the premise that she should not have to prove any specific amount of DCE. She contends that any other reading of the legislation would render it defective because defendants can avoid liability by simply not keeping records. To cure this problem, plaintiff asks the Court to broadly read the statute in her favor. In fact, such a request is one to re-write the statute, and that is the province of the legislature.

Plaintiff's second argument relies on North Carolina case law. She contends that trace amounts and contamination levels are sufficient to determine whether a discharge has occurred, *citing, Jordan v. Foust Oil Co., Inc.*, 116 N.C.App. 155, 447 S.E.2d 491 (1994), *rev. denied*, 339 N.C. 613, 454 S.E.2d 252 (1995); and *Wilson v. McLeod Oil Co. Inc.*, 327 N.C. 491, 398 S.E.2d 586 (1990), *reh'g denied*, 328 N.C. 336, 402 S.E.2d 844 (1991). These cases are inapplicable here because they involve the release of petroleum products which are not mentioned in N.C.Gen.Stat. § 143–215.77A(b). Nor are they listed in 40 C.F.R. §§ 116.4 and 117.3. Petroleum products are judged by a separate standard under the Clean Water Act which is set out in 40 C.F.R. § 110.3. That regulation states that the quantity of oil which must be charged in order to violate the Clean Water Act is an amount that either violates **"applicable water standards"** or causes "a film or sheen upon or discoloration of the surface of the water or adjoining shorelines. . . ." (Emphasis added) Therefore, courts in petroleum cases would certainly look to trace amounts and groundwater standards for proof of "discharge." This is a hazardous substance case, not a petroleum case. Because plaintiff must, at a minimum, be able to produce evidence that defendants discharged a threshold amount of DCE, plaintiff's claim fails and the Court grants defendants' motion for summary judgment under OPHSCA.

### Issue Number Two

Are plaintiff or defendants entitled to summary judgment on plaintiff's negligence per se claim?

■ Plaintiff claims that defendants are liable under negligence per se for both their violation of OPHSCA and their violation of the State's 2L groundwater regulations contamination. Both parties contend that they are entitled to summary judgment on this claim. In order to prevail on her claim of negligence per se, plaintiff must show: (1) a duty created by a statute or ordinance; (2) that the statute or ordinance was enacted to protect a class of persons which includes the plaintiff; (3) a breach of the statutory duty; (4) that the injury sustained was suffered by an interest which the statute protected; (5) that the injury was of the nature contemplated in the statute; and, (6) that the violation of the statute proximately caused the injury. *Baldwin v. GTE South, Inc.*, 335 N.C. 544, 439 S.E.2d 108 (1994).

Plaintiff's claim of negligence per se under OPHSCA clearly falls for failure to prove a breach of a statutory duty. As discussed above, there is no proof that defendants violated OPHSCA. Therefore, even assuming that all other elements were present, the element of breach is absent and plaintiff cannot use OPHSCA as a basis for negligence per se.

■ Unlike the situation with OPHSCA, defendants do not contest that they are in violation of the state's 2L regulations. North Carolina's 2L regulations are strict liability regulations which prohibit any activity which results in a discharge of listed substances which, in turn, causes a concentration of the substance above the state's groundwater limits. 15A NCAC 2L §§ .0103(d) and .0106(b) (1979) and (1989), respectively. The water under plaintiff's property currently contains DCE in excess of the concentrations allowed under 15A NCAC 2L § .0202. The parties agree that the DCE contamination on plaintiff's property was caused by the breakdown of TCA which was released from defendants' underground storage tanks.

Whether violation of North Carolina's 2L regulations constitutes negligence per se is an issue of first impression. Because the alleged standard of care is contained in administrative regulations, not statutes passed by the legislature, the Court should proceed cautiously. North Carolina case law holds that, at least in some circumstances, regula-

tions can be used to establish negligence per se. *Baldwin v. GTE South Inc.*, 335 N.C. at 546–547, 439 S.E.2d at 109–110. However, according to the *Restatement (Second) of Torts*, courts tend "to adopt administrative standards less frequently than those of legislative enactments." *Restatement (Second) of Torts* § 286 cmt. d. (1965).[7]

The first element of a negligence per se claim is that there must be a duty imposed by the regulations. Because the 2L regulations are strict liability regulations, they contain no standard whatsoever as to what constitutes "reasonable care." In such a situation, the North Carolina courts proceed with great caution before permitting a strict liability statute to operate as negligence per se. *Hurley v. Miller*, 113 N.C.App. 658, 666–667, 440 S.E.2d 286, 291 (1994). The 2L regulations are aimed at preventing pollution. They simply forbid activity resulting in pollution above the guidelines in Section .0202. A remediation scheme is activated if the forbidden result occurs. The regulations do not establish a duty of care, they merely forbid a result. It is not at all clear that the legislature expected that these regulations would govern civil liability between private parties.

The *coup de grace* to plaintiff's argument is that North Carolina does have regulations which require a specific course of conduct when installing and maintaining underground storage tanks which contain "hazardous substances." *See* 15A NCAC 2N § .0101, *et seq.* (1991). These "2N regulations," among other things, require owners and operators of UST's to keep records on the tanks, set standards for new UST systems, require existing UST's to be upgraded, require corrosion protection, set out general requirements for hazardous substance UST's, and define acceptable methods of release protection. 15A NCAC 2N §§ .0104, .0301, .0302, .0402, .0503, and .0504 (1991), respectively. These regulations would be more appropriate for

defining a duty in a negligence per se case. Unfortunately for the plaintiff, the 2N regulations did not take effect until 1991. Defendants' UST tanks were removed in 1990. Therefore, if the Court were to use state regulations to define negligence per se, it would utilize the 2N and not the 2L regulations. However, the 2N regulations do not apply in the present case. Summary judgment will be granted to defendants on plaintiff's negligence per se claim in its entirety.

### Issue Number Three

Are one or both defendants entitled to summary judgment dismissing plaintiff's negligence, nuisance and trespass claims or is plaintiff entitled to summary judgment on her trespass claim?

■ It is established North Carolina law that the enactment of various environmental statutes by the legislature has not in any way abrogated the common law protection of property encompassed by actions for negligence, trespass, or nuisance. *Biddix v. Henredon Furniture Industries, Inc.*, 76 N.C.App. 30, 40–43, 331 S.E.2d 717, 723–725 (1985) (North Carolina Clean Water Act of 1967, N.C.Gen.Stat. §§ 143–211 to –215.9); *Wilson v. McLeod Oil Co., Inc.*, 95 N.C.App. 479, 490–491, 383 S.E.2d 392, 398 (1989), *aff'd in part and rev'd in part*, 327 N.C. 491, 398 S.E.2d 586 (1990) (OPHSCA). However, in those cases where the issue of negligence survived for trial, the facts all show that the defendants knew or should have known that the tanks were leaking. *Ellington v. Hester*, — N.C.App., —, 487 S.E.2d 843 (1997); *James v. Clark*, 118 N.C.App. 178, 454 S.E.2d 826 (1995); *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 398 S.E.2d 586.

■ Defendants do not dispute that they might be liable for negligence as a result of known spilling or leaking of hazardous substances. However, they claim that plaintiff cannot produce evidence to prove such activi-

---

7. Defendants argue that the 2L regulations which concern groundwater contamination are particularly inappropriate for finding a discharge to be negligence per se absent a violation of OPHSCA. They contend that allowing recovery under the 2L regulations on a negligence per se claim would amount to permitting an adminis-

trator to circumvent the legislature. This is a persuasive point, especially because the purpose of the 2L regulations is, in part, to help implement OPHSCA. *See* N.C.Gen.Stat. § 143–215.3(a)(1) (This section is cited as statutory authority for a number of the 2L regulations.)

ty. Defendants' evidence shows that they regularly inspected and monitored the tanks, that they utilized both metering pumps and dip sticks to convey actual volume in the tanks, and that there were no observable problems or spills. (*See* Declaration of Max Leach and Deposition of H. Garfield, pp. 229–234.)

To establish negligence, plaintiff must show that defendants had a duty to inspect their UST's to determine whether the UST's were leaking before the contamination occurred. A failure to inspect, or any inspection which failed to reveal leakage, could prove negligence. This would demonstrate that defendants knew or reasonably ought to have known of the defective and unsafe condition of the tank and make them responsible for leaks.

Plaintiff urges the Court to find a duty of care to inspect UST's based on OPHSCA and environmental regulations. However, as discussed in the negligence per se section, the Court has determined that neither OPHSCA nor the North Carolina Clean Water Act nor the then extant regulations, i.e., 2L, impose a duty of inspection with respect to defendants' UST's at the time they were in the ground. Plaintiff relies on *Ellington v. Hester,* —— N.C.App. ——, 487 S.E.2d 843; *James v. Clark,* 118 N.C.App. 178, 454 S.E.2d 826; and *Wilson v. McLeod Oil Co.,* 327 N.C. 491, 398 S.E.2d 586, but all these cases involve petroleum products. In North Carolina, petroleum products have to be distinguished from other hazardous substances. Only underground storage tanks containing petroleum products must comply with statutory release detection requirements. N.C.Gen.Stat. § 143–215.94U. Therefore, at the time defendants' UST's were in the ground, they were covered by neither statutory nor regulatory provisions establishing requirements for release detection. Only UST's containing petroleum products were so covered.

Plaintiff contends *Wilson v. McLeod Oil Co.,* 327 N.C. at 517, 398 S.E.2d at 600, recognizes a common law duty to reasonably inspect UST's. However, that citation to *Wilson* is not compelling for several reasons. First, that court was not considering the issue of defining the exact duty of care of an owner of UST's with respect to adjacent landowners. Rather, it was interpreting whether the six-year statute of repose in N.C.Gen.Stat. § 1–50(5) should apply to landowners having leaking UST's as opposed to the ten-year statute of repose in N.C.Gen. Stat. § 1–52(16). The Court held that the landowner did not come within the purview of Section 1–50(5) and, in any event, would have been excluded by the exception requiring owners to inspect and maintain their premises. The Court did not cite to any case holding that landowners with UST's on their property had a duty to inspect under the common law. However, as has been noted earlier, owners of UST's containing petroleum products do have a duty to inspect UST's to determine tank leakage. The supreme court likely was referring to this statutory obligation. It is unlikely that the North Carolina Supreme Court would have modified its common law in such an abbreviated fashion.

▮▮▮ The common law does not impose on a landowner a duty to inspect UST's. Rather, negligence is premised on knowledge (actual or constructive) of the leaks. *Strand v. Neglia,* 232 A.D.2d 907, 649 N.Y.S.2d 729 (1996) (gasoline); *Mitchell v. Suburban Propane Gas Corp.,* 182 A.D.2d 934, 581 N.Y.S.2d 927 (1992) (propane); *Bassett v. Rybak,* 294 Minn. 505, 200 N.W.2d 399 (1972) (sewer line); *Wilson v. Home Gas Co.,* 267 Minn. 162, 125 N.W.2d 725 (1964) (propane gas); *Segal v. Bloom Bros. Co.,* 249 Minn. 367, 82 N.W.2d 359 (1957) ( No duty to inspect a permanently covered gas water heater). As the Virginia Supreme Court held in *Cooper v. Whiting Oil Co., Inc.,* 226 Va. 491, 495, 311 S.E.2d 757, 760 (1984), the mere fact that gasoline leaks from a tank does not establish negligence. Rather, there must be evidence of a company policy or industry practice with respect to inspections and maintenance procedures.

The instant case involves a UST for the storage of chemicals. This tank was not readily subject to inspection absent notice and knowledge. The common law does not impose a duty of inspection absent cause. Environmental statutes and regulations may now require that these tanks be subject not

only to inspection but also to monitoring. Absent an explicit indication, such statutes do not change the common law, and no North Carolina case so indicates. Nor has plaintiff come forward with any company policy or industry standard requiring monitoring of underground storage tanks filled with chemicals. In short, because plaintiff has failed to show that defendants either had a duty of inspection or had any actual or constructive notice of the leaking UST's prior to discovery of contamination, plaintiff's negligence claim must be dismissed.

Defendants next contend that plaintiff's nuisance and trespass claims should be dismissed for the same reason, i.e., lack of a duty to inspect and lack of knowledge of the leaking UST's. Defendants point out that when they received notice of the leakage, they immediately took corrective action. Plaintiff, on the other hand, seeks partial summary judgment with respect to her trespass claim, alleging that the mere fact of seepage of contaminants onto the land of another constitutes a renewing trespass, citing *Wilson v. McLeod Oil Co., Inc.,* 327 N.C. 491, 398 S.E.2d 586; *James v. Clark,* 118 N.C.App. 178, 454 S.E.2d 826; and *Jordan v. Foust Oil Co.,* 116 N.C.App. 155, 447 S.E.2d 491. Also, if not dismissed earlier, defendant SLE wants to be dismissed on the ground that there is no proof that a discharge took place when it owned the land. The Court will first address the nuisance issue.

■ The most comprehensive discussion of North Carolina nuisance law is by Justice Ervin in *Morgan v. High Penn Oil Co.,* 238 N.C. 185, 77 S.E.2d 682 (1953). Coincidentally, the case also involved the leaking of gas from an oil refinery onto an adjacent owner's land. First, the point is made that private nuisance is a field of tort liability, not a single type of tortious conduct. It, thus, covers a range of activities. Private nuisances may sometimes be classified as nuisance per se, which is a nuisance at law, meaning "an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings." 238 N.C. at 191, 77 S.E.2d at 687.

■ A private nuisance can also be a nuisance per accidens, or a nuisance in fact, which is so by reason of its location, manner, construction, maintenance or operation. Lawful businesses are not normally a nuisance per se. However, a lawful business may become a nuisance per accidens because of its operation or other factors. Furthermore, while the same act or omission may constitute negligence as well as give rise to a cause of action for private nuisance per accidens, a nuisance does not require negligence. Rather, a nuisance is the improper use of one's own property in a way which injures the land or other right of one's neighbor. *Id.* Put another way, it is "any substantial non-trespassory invasion of another's interest in the private use and enjoyment of land by any type of liability forming conduct...." 238 N.C. at 193, 77 S.E.2d at 689. The invasion may be intentional or unintentional through conduct which is negligent, reckless, or ultrahazardous. *Id.* A nuisance may come from an improper use of one's property, such as an illegal business, a threat of trespass, such as from a decayed tree, or an annoyance, such as visual height, noxious noise, odors, fumes, or fine particles. 22 Richard P. Shafer, *Strong's NC Index 4th* Nuisance (1993).

■ In order to be liable for nuisance, a defendant normally must have some prior knowledge of the threat on his property which allegedly creates a nuisance. *Contrast Andrews v. Andrews,* 242 N.C. 382, 88 S.E.2d 88 (1955) (defendant responsible for acts of wild geese lured to his pond) *with Wright v. Masonite Corp.,* 237 F.Supp. 129 (M.D.N.C. 1965), *aff'd,* 368 F.2d 661 (4th Cir.1966), *cert. denied,* 386 U.S. 934, 87 S.Ct. 957, 17 L.Ed.2d 806 (1967) (No liability for unintentional, non-negligent escape of formaldehyde gas).

■ In the instant case, defendants allege that they cannot be held liable for the nuisance because they did not commit any intentional, negligent, reckless, or ultrahazardous acts which resulted in the leaks from the UST's. The Court agrees that, under North Carolina law, defendants may not be held liable in nuisance, nothing else appearing, for the discharge of contaminants outside their tank. *Accord Strand v. Neglia,* 232 A.D.2d 907, 649 N.Y.S.2d 729 (failure of

any evidence of intentional, reckless or negligent act or admission or actual or constructive knowledge of defects in petroleum storage which caused or contributed to discharge mandates dismissal of nuisance allegation). Plaintiff has failed to produce any evidence that defendants had actual or constructive knowledge of the leaking UST's in order for them to be held responsible under common law nuisance theory for the creation of the threat to adjoining property.[8] However, that does not end the matter.

■ North Carolina nuisance law not only encompasses the creation of threats to property, but also the maintenance of threats. Maintenance theory covers threats of nuisances causing continuous injuries and recurrent trespasses. *Anderson v. Town of Waynesville,* 203 N.C. 37, 164 S.E. 583 (1932) (raw sewage). Even though a property owner does not create a hazardous waste dump, the fact of ownership will expose him to liability for the hazardous conditions on account of maintenance, in other words knowingly allowing the nuisance to continue. *Nassr v. Commonwealth,* 394 Mass. 767 775–76, 477 N.E.2d 987, 993 (1985). Under this theory, a landowner is responsible for abating a nuisance and must clean it up after having become aware of it. North Carolina has inferentially approved this theory of liability by its recognition of recurrent contamination liability. This theory applies to both nuisances and trespass. Recurrent nuisances or trespasses result from the continued leakage and migration of contaminants from UST's onto adjoining property. *Wilson v. McLeod Oil Co., Inc.,* 327 N.C. at 513, 398 S.E.2d at 596; *James v. Clark,* 118 N.C.App. at 185, 454 S.E.2d at 831. The continued migration of contaminants remains a nuisance and when each contaminant crosses onto an adjoining property, there is a new trespass and injury.

■ In the instant case, plaintiff has presented evidence that defendants knowingly permitted the maintenance of a nuisance on their land by failing to remove and abate the nuisance through clearing the contamination from their soil. Thus, the threat in the instant case arises from the maintenance of the contamination, as opposed to the creation of it by the leakage.

■ In addition, proof of maintenance of a private nuisance per accidens requires more than showing a threat of contamination. Plaintiff must show that the threat amounts to a substantial interference with her use of the property. In North Carolina, proof of interference requires proof of substantial annoyance, material physical discomfort, or injury to the health or property of the adjoining landowner. *Pake v. Morris,* 230 N.C. 424, 53 S.E.2d 300 (1949); *Holton v. Northwestern Oil Co.,* 201 N.C. 744, 161 S.E. 391 (1931) (odor from gas station). The touchstone is reasonableness where the social utility of defendants' use is balanced against the harm and interference with plaintiff's use of her property. *Pendergrast v. Aiken,* 293 N.C. 201, 236 S.E.2d 787 (1977). The anticipated injuries must be more than conjectural and amount to actual interference with her use and enjoyment of her property. Mere diminution in market value will not suffice. *Twitty v. State,* 85 N.C.App. 42, 354 S.E.2d 296, *rev. denied,* 320 N.C. 177, 358 S.E.2d 69 (1987); *Moody v. Lundy Packing Company,* 7 N.C.App. 463, 466–67, 172 S.E.2d 905, 908–09 (1970) (construction of hog farm and station). Plaintiff has presented sufficient evidence to permit a jury to find nuisance based on threat of continued trespass and the need

---

**8.** Plaintiff has not alleged or shown that the storage of chemicals constitutes an ultrahazardous activity. In *Wright v. Masonite Corp.,* 237 F.Supp. 129 (M.D.N.C.1965), *aff'd,* 368 F.2d 661, 663 (4th Cir.1966), *cert. denied,* 386 U.S. 934, 87 S.Ct. 957, 17 L.Ed.2d 806 (1967), the Fourth Circuit held that escaping noxious gases did not constitute an ultrahazardous activity under North Carolina law.

Some courts hold that the discharge of hazardous substances constitutes a public nuisance if the material is on any state or federal lists for hazardous substances. *State v. Fermenta ASC Corp.,* 160 Misc.2d 187, 195–96, 608 N.Y.S.2d 980, 985 (1994). In *Newhall Land and Farming Co. v. Superior Court (Mobil Oil Corp.),* 19 Cal. App.4th 334, 341–42, 23 Cal.Rptr.2d 377, 381 (1993), the court found that the pollution of water constitutes a public nuisance and discharge of waste in violation of statute is a public nuisance per se. However, because plaintiff has not raised this theory, the Court will not pursue it.

to install monitoring wells. Defendants' motion for summary judgment will be denied.

 The Court now addresses the parties' cross-motions for summary judgment on the trespass claim. The elements for a trespass caused by leaking hazardous substances are as follows: (1) plaintiff was in possession of the property; (2) the defendant himself, or an object under his control, voluntarily entered, caused to enter or remained present upon plaintiff's property; and, (3) the entry was unauthorized. *Jordan v. Foust Oil Co., Inc.*, 116 N.C.App. at 166, 447 S.E.2d at 498. A plaintiff may recover nominal damages even without the proof of actual damages. *Lee v. Stewart*, 218 N.C. 287, 288, 10 S.E.2d 804, 805 (1940).

 If a nuisance may be viewed as a threat to adjoining property, the trespass is then the actualization of that threat. However, like nuisance, there must be some intent involved. This is not an intent to do injury, but merely an intent to go upon the land of another. Thus, the unintentional and non-negligent entry onto the land of another does not constitute a trespass unless the actor is engaged in an ultrahazardous activity.[9] *Schloss v. Hallman*, 255 N.C. 686, 691, 122 S.E.2d 513, 517 (1961). However, trespass will lie even though the person had a bona fide belief that entry was permissible. *York Indus. Center, Inc. v. Michigan Mut. Liability Co.*, 271 N.C. 158, 155 S.E.2d 501 (1967).

 Trespass requires an invasion, but nuisance does not. *Contrast Davenport v. Pitt County Drainage Dist. No. 2*, 220 N.C. 237, 17 S.E.2d 1 (1941) (overflow caused by ponded water is trespass), *with Forest City Cotton Co. v. Mills*, 218 N.C. 294, 10 S.E.2d 806 (1940), *reh'g granted*, 219 N.C. 279, 13 S.E.2d 557 (1941) (overflow caused by sediment deposit when dam slowed stream flow not an invasion, hence not a trespass).

 As was the case with nuisance, defendants request dismissal of the trespass action on the ground that the unintentional, non-negligent discharge of a hazardous substance on their property alone does not constitute a trespass, particularly when they had no knowledge of the leak. The Court not only agrees with that proposition, but also its extension to the unknown migration of contaminants onto plaintiff's property. *Wright v. Masonite Corp.*, 237 F.Supp. 129, *aff'd*, 368 F.2d 661 (while analyzed in terms of nuisance, the case actually involved a trespass when the formaldehyde migrated onto plaintiff's property); *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 915 P.2d 80 (1996) (Contamination leakage. No intentional or other act done with knowledge to a substantial certainty that entry would result. Mere knowledge that had a substance reached the land of another not sufficient to establish a trespass.). In the instant case, plaintiff has not shown that the cause of the leakage resulted from defendants' intentional, negligent, reckless, or ultrahazardous activity.

 However, once defendants became aware of the contamination, which they did upon removal of the tank, then they became responsible for any continued migration of the contaminants onto plaintiff's land. At this point, defendants' acts of omission directly resulted in the invasion of plaintiff's property because they admit knowledge of the contaminated plume and do not dispute that this plume has and is migrating onto plaintiff's property. These admissions amount to proof to a substantial certainty that contaminants on defendants' property will reach plaintiff's. Consequently, one or both of defendants may be held liable for trespass as a matter of law and plaintiff's motion for summary judgment on grounds of trespass may be granted at this time with respect to TCA, DCE, and DCA.[10]

9. An example of an ultrahazardous activity creating strict liability without intention or negligence would be blasting. *Guilford Realty & Ins. Co. v. Blythe Bros. Co.*, 260 N.C. 69, 131 S.E.2d 900 (1963).

10. It should be noted that even though defendants only kept the chemical TCA in its storage tank, evidence shows that TCA breaks down into DCE and DCA. Under the law of trespass, defendants will be held liable for the actual contaminants released and any alteration of those contaminants which the evidence shows inevitably or to a substantial certainty will become so altered and reach plaintiff's property.

■ Because the trespass and nuisance claims have not been dismissed as to SLE, the Court will entertain its separate argument that it is nevertheless entitled to dismissal because there is no proof of nuisance or trespass while it owned the land. The Court agrees that SLE is entitled to dismissal, but for slightly different reasons. It is undisputed that discovery of the contamination did not occur until three years after SLE sold the property to defendant Electrolux. Until that time, defendant SLE was not aware of the leak or contamination. For the reasons previously discussed, defendant SLE cannot be held responsible for any nuisance or trespass existing prior to the discovery and knowledge of contamination in 1990. Because SLE did not own the land at the time, it cannot be held liable to third parties. This decision is compelled by the common law rights and responsibilities of property owners.

At the time contamination was discovered, SLE no longer owned the property and, therefore, had no ability to remediate the soil to stop the trespass of any contaminants released while it owned the property. Rather, it became the current property owner's responsibility to clean up the contamination in order to stop the trespass. Under the common law, liability, if any, falls entirely on the current property owner. It was incumbent on the new property owner (here Electrolux) to protect itself from this consequence in its contract to purchase the property. *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950 (1994). While there is no North Carolina case on point, it is believed the North Carolina Supreme Court would apply these same common law principles. Of course, under new federal and state environmental legislation, prior property owners may well be liable. *See* Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.* (CERCLA).

■ SLE will be dismissed as a party. Electrolux faces injunctive relief and/or damages for its trespass and possibly for nuisance. In North Carolina, the landowner may recover permanent damages from a defendant municipality or other corporation having the power of eminent domain when said body intends to continue committing trespass or nuisance.[11] In such situation, the remedy of abatement is not available to the landowner. *Wiseman v. Tomrich Const. Co.,* 250 N.C. 521, 109 S.E.2d 248 (1959).

■ When eminent domain is not involved, the landowner may not normally recover permanent damages as a matter of right from a private corporation or individual for the maintenance of a nuisance unless both consent to that remedy. The landowner's remedy lies in abatement through either the voluntary cessation by the defendant or a court injunction. The defendant may be stimulated toward voluntary abatement by a repeated mulcting for damages. *Id.* However, if the nuisance has become permanent in nature, so that it will produce injury independent of any subsequent wrong, then a landowner may recover the entire damages, both past and prospective. *Id.*

■ With respect to enjoining trespass and nuisances, several principles should be mentioned. First, substantial evidence that the nuisance will result in a trespass in the future will support an injunction. *Owen v. Claude De Bruhl Agency, Inc.,* 241 N.C. 597, 86 S.E.2d 197 (1955). Second, the Court may restrain a future use of property if it appears to a reasonable certainty that the danger is real and immediate. *Causby v. High Penn Oil Co.,* 244 N.C. 235, 93 S.E.2d 79 (1956).

### Issue Number Four

Do plaintiff's claims for stigma or lost opportunity in damages fail as a matter of law?

Plaintiff seeks both injunctive relief and damages. The damages include: loss of timber sales; inability to sell the property, as well as the loss of the use of proceeds from such a sale; diminished property value due to the groundwater contamination; diminish-

---

11. Pursuant to N.C.Gen.Stat. § 1–539, the legislature has altered common law remedies for nuisance by specifically providing that nuisance injuries are to be the subject of actions as any other injuries and there may be judgment for damages or for removal of the nuisance or both.

ed property value due to the stigma of contamination; and out-of-pocket expenses. Plaintiff also requests that a permanent injunction be entered requiring defendants to remediate the contamination and post a bond to ensure adequate performance in cleaning up the property. Plaintiff also prays for a declaratory judgment making defendants liable for all future costs and damages. Defendants claim that plaintiff cannot receive an injunction and recover damages, cannot recover future damages for an abatable nuisance, and cannot recover "stigma" or "lost opportunity" damages.

■ Once nuisance liability is established, North Carolina provides for two forms of relief: injunction and/or damages. The relief granted depends upon the nature of the invasion into a plaintiff's interest in the use and enjoyment of land. *Phillips v. Chesson*, 231 N.C. 566, 569–70, 58 S.E.2d 343, 346–47 (1950). For a permanent nuisance, plaintiff may only recover damages, and these are identical to those awarded in a case of a permanent trespass, i.e., the depreciation in the market value of the property due to the nuisance. *Id.*

■ For an abatable or temporary nuisance, whether continuous, renewing, or recurrent, the remedy may include both injunctive relief and money damages. However, damage awards for temporary nuisances generally do not compensate a plaintiff for all the past, present, and future harms because of the nuisance. Plaintiff can only recover damages up to the time of the complaint or trial. *Webb v. Virginia–Carolina Chemical Co.*, 170 N.C. 662, 666, 87 S.E. 633, 635 (1916). Future damages must be recovered in successive actions. *Id.* The kinds of damages recoverable include: diminished rental value; reasonable costs of replacement or repair; restoration of the property to its pre-nuisance condition; and other added damages for incidental losses. *Phillips v. Chesson*, 231 N.C. at 571–72, 58 S.E.2d at 348.[12]

■ If at trial plaintiff establishes a permanent trespass, she may recover the diminished market value of her property. Otherwise, and unless the parties agreed to a market value resolution, plaintiff may recover any actual damages to the date of trial and possibly receive an injunction.

■ Defendants assert that North Carolina law bars recovery for stigma damages. They are correct if they are referring to temporary or abatable nuisances. They are incorrect if they are referring to a permanent nuisance which involves a diminution of value, regardless of the outcome of remediation. In such instance, stigma is one of the factors which may be utilized in determining market price. *See Appeal of Camel City Laundry Co.*, 123 N.C.App. 210, 217, 472 S.E.2d 402, 406–07 (1996), *rev. denied*, 345 N.C. 342, 483 S.E.2d 162 (1997) (can discount value and deduct amortized cost of remediation because of contamination and remediation efforts); *Adkins v. Thomas Solvent Company*, 440 Mich. 293, 487 N.W.2d 715 (1992). In *Santa Fe Partnership v. ARCO Products Co.*, 46 Cal.App.4th 967, 977, 54 Cal.Rptr.2d 214, 220 (1996), the court found that stigma damages are not permitted unless the nuisance is classified as permanent, which it noted that some courts do with environmental contamination. Under this theory, the fact of contamination must be found to likely be present for an indefinite, but significant, period of time. *Id.* (collecting cases); *Mel Foster Co. Properties, Inc. v. American Oil Co. (Amoco)*, 427 N.W.2d 171, 174–75 (Iowa 1988). Other courts require that the damaging agent continue to present some ongoing risk to their land. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir.1994), *cert. denied sub nom, General Elec. Co. v. Ingram*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Because it is possible that plaintiff might establish a permanent nuisance or trespass, the Court cannot rule out stigma damages.

■ Plaintiff also seeks damages for lost opportunities to sell her property due to the contamination. North Carolina law permits

---

12. Some commentators indicate that incidental losses might include, under appropriate circumstances, recovery of plaintiff's reasonable costs incurred to prevent future injury or abate the nuisance or its harmful effects. W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts* § 89 at 640 (5th ed.1984).

damages for lost opportunities proven to a reasonable certainty. *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 546–47, 356 S.E.2d 578, 586, *reh. denied,* 320 N.C. 639, 360 S.E.2d 92 (1987).

 Defendants complain that plaintiff's evidence of lost opportunity is too speculative. *Pinehurst Area Realty, Inc. v. Village of Pinehurst,* 100 N.C.App. 77, 394 S.E.2d 251 (1990), *appeal dismissed, rev. denied,* 328 N.C. 92, 402 S.E.2d 417, *cert. denied,* 501 U.S. 1251, 111 S.Ct. 2890, 115 L.Ed.2d 1055 (1991). Plaintiff mistakes defendants' argument to be that North Carolina does not permit lost opportunity damages. In fact, defendants show that plaintiff's proof of lost opportunity damages is insufficient for being conclusory (Rudd Dep. at 167) and that she did not lose any offers or contracts as a result of the contamination. (Plaintiff's supplemental interrogatory answers.) Plaintiff fails to show otherwise. Therefore, defendants are entitled to have plaintiff's request for lost opportunity damages stricken.

### *Conclusion*

In conclusion, defendants' motions for summary judgment dismissing plaintiff's claims of OPHSCA violations, negligence per se, and negligence are granted as to both defendants. Defendants' motions for summary judgment dismissing plaintiff's claims of trespass and nuisance are denied with respect to defendant Electrolux and granted in their entirety with respect to defendant SLE only. Plaintiff's motion for summary judgment on her trespass claim is granted against defendant Electrolux only, with the issue of damages, except lost opportunity damages, being set for trial. Plaintiff's claim of nuisance against defendant Electrolux will be set for trial on the issues of liability and damages. Plaintiff's request for the summary judgment entry of an injunction is denied without prejudice.

**IT IS THEREFORE ORDERED** that the parties' cross-motions for summary judgment are granted in part and denied in part and (1) that defendant SLE, and all claims against it, are dismissed with prejudice, (2) that all of plaintiff's claims against defendant Electrolux are dismissed, except for her third and fourth claims for relief based on nuisance and trespass, (3) that plaintiff's motion for summary judgment is denied, except that defendant Electrolux is liable in trespass to plaintiff with respect to TCA, DCE, and DCA, (4) that plaintiff's request for immediate entry of a permanent injunction is denied without prejudice, and, (5) plaintiff's request for lost opportunity damages is hereby stricken.